STERLING MERCHANDISE COMPANY, APPELLEE AND CROSS-APPELLANT, *v.* HARTFORD INSURANCE COMPANY ET AL., APPELLANTS AND CROSS-APPELLEES.

(Nos. 12199 & 12284 — Decided January 15, 1986.)

*Richard T. Cunningham* and *Jack Morrison, Jr.,* for appellee and cross-appellant.

*David Hilkert,* for appellant and cross-appellee, Hartford Ins. Co.

*Jack Alton* and *John A. Fiocca, Jr.,* for appellants and cross-appellees, Underwriters at Lloyds of London et al.

GEORGE, P.J. Defendants-appellants, Underwriters at Lloyds of London, Ennia Insurance Company (U.K.) Limited, and Terra Nova Insurance Company Ltd. (hereinafter referred to collectively as "Underwriters"), appeal the order of the trial court finding that plaintiff-appellee, Sterling Merchandise Company ("Sterling"), was covered under the policies issued by Underwriters for a loss resulting from an unauthorized entry into one of Sterling's jewelry store safes. Sterling, as cross-appellant, appeals the trial court's denial of its claim for prejudgment interest dating from the time of the loss.

In 1981, Sterling opened a new jewelry store in Los Cerritos, California. At that time, Sterling requested from its regular insurance agent, Ostrov Corpor-ation, an additional $250,000 in coverage for loss due to burglary of the safe used at the new store. Ostrov procured policies from Hartford Insurance Company and Underwriters containing specific insurance entitled "safe burglary" insurance. The policies were delivered to Ostrov, but Ostrov, at the instruction of Sterling, retained possession of the policies. No one from Sterling ever received the policies prior to December 19, 1982. On that date, an unauthorized entry resulting in a loss occurred at the Los Cerritos store.

The facts and events surrounding the unauthorized entry and theft on December 19, 1982 have been stipulated by the parties as follows:

"(a) At closing time, 6:00 p.m., the store employees closed and locked the steel gate which leads to the main mall corridor.

"(b) The employees then took all the jewelry in the store, placed it in cardboard boxes, and placed the boxes in the safe.

"(c) The employees then placed two file tubs and the cash box in the safe and closed the safe door.

"(d) All except two employees went into the rear hallway, keeping surveillance and waiting for the remaining two.

"(e) The two remaining employees locked the store's safe, into which the store's inventory had been placed, manually checked the handle and spun the combination knob, locking the safe.

"(f) They then set the alarm and tested it to make sure it was set. The safe and store were protected by a three-trigger Honeywell burglar alarm system. The first trigger is wired into all the exterior doors of the store, including the back door. The second trigger is a sonic alarm, sensitive to noise or physical intrusion in the protected space. This trigger was located in the ceiling above the safe. The third trigger is bolted onto the outside of the safe and is

attached to the exterior of the only door of the safe; it is activated by the opening of the safe door. These triggers are wired in a series, through one electric circuit, into an outside Honeywell monitoring device.

"(g) The activation of any one of these triggers sets off a visual, graphic, and audible signal at the Honeywell monitoring service site.

"(h) The activation of any one of these triggers sets off an audible signal at the store.

"(i) After setting these alarms, the two employees turned off the lights and exited together by the rear door.

"(j) One employee locked the door with a key. The other employee checked the handle and confirmed that it was locked.

"(k) All employees then walked in a group to a parking lot.

"(l) Some time after 6:00 p.m., the shopping mall security dispatcher received a phone call from a male caller whose voice she did not recognize. The caller falsely identified himself as the Assistant Manager of Musicland, another shop in the mall. He falsely advised the dispatcher that they would be making deliveries to Musicland and that security officers should not be suspicious if they saw a red [T]oyota parked outside the corridor behind plaintiff's store. The caller could not be identified as an employee of plaintiff. After the store was secured, as set forth above, and after the employees had left the mall, between 6:20 and 6:30 p.m. the alarm system was activated.

"(m) Members of the Los Angeles Sheriff's Department arrived at the scene at 6:38 p.m.

"(n) When the police arrived, they found the rear door closed but unlocked. There were no signs, observable to the naked eye, that this locked door was opened with any tool. Inside the store, the police found the safe door closed and locked. Jewelry display boxes and a file tub which had been placed in the safe that night were found lying on the floor outside the safe. The jewelry which had been in the display boxes was missing. One of the store employees, who was called by security, arrived at the store and opened the safe by combination. Nearly all of the safe's contents were missing.

"(o) The police found fingerprints of an unknown person upon the top of the inside of the door of the safe. The fingerprints did not match any fingerprints of any employee, current or past, of plaintiff.

"(p) There was an unauthorized entry into the safe; however, there were no marks observable to the naked eye of such entry made by tools, explosives, electricity or chemicals upon the exterior of the only door of the safe.

"(q) Those responsible for the loss entered, without authorization, this store through the back door.

"(r) The entry into the safe (Item p) and the entry into the store (Item q) were each an unauthorized entry made with the intent to deprive Sterling of its property which was stored in the safe and taken therefrom.

"(s) The identities of the individuals responsible for the loss is [*sic*] not known. Interrogation by the police of all employees of the store, including the taking of lie detector tests, did not establish involvement by the employees current or past.

"* * *"

Both Hartford and Underwriters refused to pay Sterling's claim for the Los Cerritos theft contending that it did not come within the terms of the policies issued. The insurance contracts issued to Sterling by Underwriters define a "safe burglary" as follows:

" 'SAFE BURGLARY' means the felonious abstraction of the insured property from within a safe or vault in the premises (or after removal therefrom by burglars) by any person or per-

sons making felonious entry into such safe and also into the vault, if any, containing such safe, when all doors of such safe and vault are duly closed and locked by at least one combination, key or timelock thereof; provided that such entry shall be made by actual force or violence of which there shall be visible marks made by tools, explosives, electricity, gas or chemicals, upon the exterior of (1) all os [*sic*] said doors of such safe and vault, if any, containing such safe if entry is made through such doors, or (2) the top, bottom, or walls of such safe and of the vault through which entry is made, if not made through such doors."

Sterling brought an action against Hartford and Underwriters seeking payment of its claim under the policies. After determining that Ohio law controlled, the trial court applied the doctrine of reasonable expectations and rendered judgment in favor of Sterling. Subsequently, the trial court denied Sterling's motion for prejudgment interest from the date of the burglary. Hartford, Underwriters and Sterling each filed an appeal. These were consolidated by order of this court. Hartford settled with Sterling prior to this case being argued and hence its appeal was dismissed.

The judgment of the trial court is reversed on the basis of Underwriters' assigned errors. Therefore, Sterling's assignment of error is not addressed. Further, since Underwriters' assignments of error are interrelated they are considered together.

### Assignments of Error

"I. The lower court erred in its determination that the definitions of 'safe burglary' as contained in appellants' policies of insurance issued to appellee, are unclear and ambiguous.

"II. The lower court erred in its determination that the principles set forth by the Ohio Supreme Court in the case of *Ady* v. [*West*] *American Insurance Company*, 69 Ohio St. 2d 593 (1982),

mandates [*sic*] that the definition of safe burglary as found in the policy, is void and contrary to public policy.

"III. The lower court erred in its determination that the loss suffered by appellee is covered by appellants' policies of insurance under a doctrine of reasonable expectations."

### I. *Trial Court's Application of the Reasonable Expectations Doctrine.*

### A. *Adoption of the Doctrine in Ohio.*

The trial court's decision is based entirely on the doctrine of reasonable expectations found in the Iowa Supreme Court case of *C & J Fertilizer, Inc.* v. *Allied Mut. Ins. Co.* (Iowa 1975), 227 N.W. 2d 169, 176-177. The trial court justified application of this doctrine on the doctrine's implicit adoption by Ohio in cases such as *Ady* v. *West American Ins. Co.* (1982), 69 Ohio St. 2d 593, 23 O.O. 3d 495, 433 N.E. 2d 547, and *River Services Co.* v. *Hartford Acc. & Indemn. Co.* (N.D. Ohio 1977), 449 F. Supp. 622.

The doctrine of reasonable expectations is a theory of recovery employed in contract actions. It has been articulated in the following passage contained in the Restatement of the Law 2d, Contracts (Tent. Drafts Nos. 1-7 Rev. 1973), Section 237 ("Standardized Agreements"), Comment *f*, at 540-541:

"*Terms excluded.* * * * Although customers typically adhere to standardized agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation. A debtor who delivers a check to his creditor with the amount blank does not authorize the insertion of an infinite figure. Similarly, a party who adheres to the other party's standard terms does not assent to a term if the other party has reason to believe that the adhering party would not have accepted the agreement if he had known that the agreement contained the particular term. Such a belief or assumption may

be shown by the prior negotiations or inferred from the circumstances. Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from the fact that it eviscerates the non-standard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction. The inference is reinforced if the adhering party never had an opportunity to read the term, or if it is illegible or otherwise hidden from view. This rule is closely related to the policy against unconscionable terms and the rule of interpretation against the draftsman.* * *"

This doctrine is grounded on several beliefs. First, that most people never read the insurance contracts they sign, but merely adhere to them. Second, that insurers write the terms of the contracts and usually offer the consumer only a standard preprinted form which the latter is ill-equipped to understand. Third, that the insured lacks any real bargaining power in such a situation because the insurer assumes a take-it-or-leave-it attitude. Fourth, that to enforce the terms of the contract in favor of the insurer is somehow unconscionable.

The trial court found that Sterling's reasonable expectation in purchasing burglary insurance from Underwriters was that it was covered for the type of loss suffered on December 19, 1982. The trial court relied on those Ohio cases enunciating the rules of construction to be applied in interpreting insurance contract provisions. From these cases the court then concluded that Ohio had implicitly adopted the reasonable expectations doctrine. Such was error. First, *Ady, supra,* upon which the trial court placed much reliance, dealt specifically with exclusions of uninsured motorist coverage in automobile policies. More importantly, that decision held that the exclusion in question did not comply with the intent or purpose of R.C. 3937.18, the statute mandating uninsured motorists coverage. Thus, the exclusion's repugnancy to the statute and

not its inconspicuousness, complexity, or non-acceptance was the basis for the court's holding. See *Ady, supra,* at 603, 23 O.O. 3d at 499, 433 N.E. 2d at 551 (Clifford F. Brown, J., concurring).

Although Ohio has adopted rules of construction of insurance contracts which favor the insured, it has not implicitly adopted the theory of recovery known as the reasonable expectations doctrine. That doctrine is based on principles which go far beyond the liberal rules of construction employed by Ohio courts. The law review article upon which the Iowa Supreme Court's decision in *C & J Fertilizer, Inc., supra,* draws much of its reasoning is illustrative:

"The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.

"* * *

"If enforcement of a policy provision would defeat the reasonable expectations of the great majority of policyholders to whose claims it is relevant, it will not be enforced even against those who know of its restrictive terms." Keeton, Insurance Law Rights at Variance with Policy Provisions (1970), 83 Harv. L. Rev. 961, at 967, 974.

Thus, the reasonable expectation doctrine requires a court to rewrite an insurance contract which does not meet popular expectations. Such rewriting is done regardless of the bargain entered into by the parties to the contract. Such judicial activism has not been adopted in Ohio by its courts and the courts' use of liberal rules of construction. Further, this court declines to do so.

B. *Inapplicability of the Doctrine to the Instant Facts.*

The facts of this case, as evidenced by the stipulations of the parties, do not indicate any misrepresentation, over-

reaching, or other conduct on behalf of the insurer which would justify abrogating the parties' agreement. Nor was there any evidence that Sterling was beguiled into believing it had more protection than it actually did.

Sterling tacitly refused to read its policies. The provision defining "safe burglary" was written in the same style and size type as the rest of the policy provisions. The definition was not hidden away in fine print in an obscure place, but was plainly set out. The definition was not so complex or esoteric that a competent businessman could not understand it.

All these facts, and more, clearly distinguish this case from that of *C & J Fertilizer, Inc., supra,* and lead to the conclusion that the doctrine does not apply here. In the Iowa case, the insured had a conversation with his agent concerning the requirements of coverage under the contract. That agent merely told him that evidence of a burglary would be required but did not indicate visible marks were required on an outside as opposed to an inside door. Here, Sterling chose not to discuss the terms of the policies with its agent. In the Iowa case, the insured was a thirty-seven-year-old farmer with little in the way of formal education. In the instant case, the insured is a large company presumably run by astute business people. Finally, in the Iowa case there were visible marks of forced entry on an inner storeroom door which had been broken into. Here there were none.

The record in the instant case also reveals that there was comprehensive crime coverage available to Sterling, but at an additional cost. This additional coverage was noted in part seven of Sterling's policy with Hartford which reads:

"1. COVERAGES
"LIMITS OF LIABILITY

"Insuring Agreement 1A Employee Dishonesty (Commercial Blanket) Coverage. $_____ .

"Insuring Agreement 1B Employee Dishonesty (Blanket Position) Coverage. $50,000

"Insuring Agreement II Loss Inside the Premises Coverage. $_____

"Insuring Agreement III Loss Outside the Premises Coverage. $_____

"Insuring Agreement IV Money Orders and Counterfeit Paper Currency Coverage. $_____

"Insuring Agreement V Depositors Forgery Coverage. $_____

"If added by endorsement: Insuring Agreement B1437 Mercantile Robbery & Safe Burglary $ See schedule attached."[1]

The "Employee Dishonesty" coverages apply to embezzlement and other "inside jobs." "Mercantile Robbery & Safe Burglary" coverage is a distinctly different type of coverage, as evidenced by the fact of the Hartford policy. In *Markline Co.* v. *Travelers Ins. Co.* (1981), 384 Mass. 139, 424 N.E. 2d 464, the Supreme Court of Massachusetts refused to apply the reasonable expectations doctrine where the insured had purchased burglary insurance with a visible marks requirement. That court observed that the insured's policy was one covering burglary, not theft. *Id.* at 141, 424 N.E. 2d at 465. As in *Markline Co.,* the insured in the instant case purchased burglary, but not theft insurance.

Other factors dictate that the doctrine not be applied here. First, there is no indication that Underwriters had any reason to believe that Sterling would not

---

[1] The schedule referred to sets out the amount and sequence of the liability assumed by each *underwriter.* A reading of the policy indicates that Insuring Agreement 1B was the only coverage purchased from Hartford. The record is silent as to whether Sterling recovered under 1B.

have assented to the provision defining "safe burglary." See Restatement, *supra.* The definition is not bizarre or oppressive, but is in fact standard in the industry. 5 Appleman, Insurance Law & Practice (1970) 516, Section 3176. Courts have declined to apply the doctrine in factual situations similar to the instant case. *Markline Co., supra.* In *Chipokas* v. *Travelers Indemn. Co.* (Iowa 1978), 267 N.W. 2d 393, the Iowa Supreme Court refused to apply the doctrine saying:

"* * * [W]e refused to extend the doctrine to cases where an ordinary layman would not misunderstand his coverage from a reading of the policy and where no circumstances appear attributable to the insurer which would foster coverage expectations. There is nothing in the record in the instant case which indicates Travelers by its conduct led plaintiff to expect he might be defended for claims which reach beyond the policy's liability coverage. Neither does the language of the policy lend itself to such an expectation." *Id.* at 396.

Although *Chipokas* did not deal with a definition of "safe burglary," it is illustrative of the scope of the doctrine. It does not apply where the language used is understandable and the insurer's conduct does not create any false expectations of coverage.

In sum, the doctrine of reasonable expectations has not been implicitly adopted by the courts of Ohio. Further, even if the doctrine were to apply, it would not be available to Sterling under the facts of this case.

## II. *The Enforceability of the Contract Provision Under the Accepted Rules of Construction.*

### A. *Construction & Validity*

One of the cardinal rules in the interpretation and construction of ambiguous insurance contract terms or provisions is that any such term or provision be construed liberally in favor of the insured and strictly against the drafter.

*Ohio Farmers Ins. Co.* v. *Wright* (1969), 17 Ohio St. 2d 73, 46 O.O. 2d 404, 246 N.E. 2d 552. Further, any reasonable construction which results in coverage of the insured must be adopted by the trial court in Ohio. *River Services Co., supra,* at 626. The first question to be asked, however, is whether the term in question is ambiguous:

"* * * When words used in a policy of insurance have a plain and ordinary meaning, it is neither necessary nor permissible to resort to construction unless the plain meaning would lead to an absurd result.* * *" *Olmstead* v. *Lumbermens Mut. Ins. Co.* (1970), 22 Ohio St. 2d 212, 216, 51 O.O. 2d 285, 288, 259 N.E. 2d 123, 126.

The trial court did not find the "safe burglary" definition to be ambiguous. Neither does this court. Provisions requiring visible marks of entry by actual force or violence before coverage is allowed are not ambiguous. 5 Appleman, Insurance Law & Practice (1970) 516-535, Sections 3176 & 3177; 10A Couch, Insurance 2d (1982) 271-290, Sections 42:140-42:160. Because the definition is not ambiguous, it must be given its plain and ordinary meaning. *Olmstead, supra.*

Sterling contends that the sole purpose of the provision is evidentiary in that it protects the insurer from fraudulent claims. While the visible marks requirement does protect the insurer from false claims, its purpose is not solely evidentiary. 10A Couch, Insurance 2d (1982) 272, Section 42:141. The visible marks requirement is not a rule of evidence, but a limitation on liability. *Markline Co., supra.* The requirement sets the parameters of the coverage, and is not an exclusion in the sense that the term is used.

The insured must show facts sufficient to prove that its loss was within the description of the policy. *Markline Co., supra.* Under the trial court's interpretation of the visible marks requirement, the burden is on the insurer to

prove that an inside job has occurred before it is permitted to deny coverage. The burden, however, is not on the insurer, but on the insured to prove that he is entitled to coverage.

### B. *Sterling's Entitlement to Coverage.*

Sterling contends that even if the definition of "safe burglary" is a valid and enforceable limitation on liability, its particular loss still falls within that definition. Sterling makes the rather ingenious argument that the electronic signal sent to the alarm monitoring site was a "visible mark" of entry by force or violence. This court does not agree.

Evidence of the activation of the burglar alarm alone is insufficient as a matter of law to support a finding of a "visible marks" forced entry. Here, there was no evidence whatsoever of force. Since the policy of insurance required visible evidence of forced entry, the insured is not entitled to recover under this policy provision. Accordingly, the Underwriters' assignments of error are sustained. The judgment of the trial court is reversed and judgment is hereby rendered in favor of Underwriters.

*Judgment accordingly.*

MAHONEY and BAIRD, JJ., concur.