NORTHBROOK EXCESS AND
SURPLUS INSURANCE
COMPANY, Plaintiff,

v.

PROCTER & GAMBLE COMPANY,
Procter & Gamble Manufacturing Company and Procter & Gamble Distributing Company, Defendants–Counterclaimants–Appellants,

v.

COMMERCIAL UNION INSURANCE
COMPANY and American Employers
Insurance Company, Counterclaim Defendants–Appellees.

Nos. 89–2506, 89–3128.

United States Court of Appeals,
Seventh Circuit.

Argued April 17, 1990.

Decided Jan. 4, 1991.

As Corrected Feb. 14 and Feb. 15, 1991.

634

Paul E. Freehling, Patricia T. Bergeson, Diane D. Jones, Pope, Ballard, Shepard & Fowle, Chicago, Ill., and Robert J. Miller, Cincinnati, Ohio, for Procter & Gamble Co. and Procter & Gamble Mfg. Co.

Shaun McParland Baldwin, Robert S. Soderstrom, Daniel R. Formeller, Tressler, Soderstrom, Maloney & Priess, Chicago, Ill., and Bruce M. Allman, and Christopher M. Bechhold, Thompson, Hine & Flory, Cincinnati, Ohio, for Commercial Union Ins. Co. and American Employers Ins. Co.

Before FLAUM and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

This diversity case presents a question of Ohio law. An insurance company and its insured dispute the amount of coverage afforded under an insurance policy. The controversy turns on whether the policy's deductible amount was $1 million or $10 million. A jury determined the deductible was $10 million. The district court entered judgment based on that verdict and awarded the insurance company costs as the prevailing party. The insured filed a timely appeal. For the following reasons, we affirm the judgment of the district court, except for its ruling that expenses incurred in producing the insurance company's computer data base were taxable costs. We remand that issue for further proceedings.

## I

## BACKGROUND

The factual background and the procedural history are complex. In the following paragraphs, we shall present only those aspects necessary to orient the reader to the present appeal. More detailed factual information will be discussed with our consideration of various issues presented by the parties for our decision.

### A. *Facts*

This case began as a dispute over responsibility for Procter and Gamble's (P & G)[1] legal fees and settlement costs. These expenditures arose from more than one thousand injury and death claims brought against P & G since 1980 by users of P & G's Rely tampons (the so-called Toxic Shock Syndrome cases).[2] The dispute involved P & G and several insurance companies that issued liability policies to P & G covering the period when injuries were allegedly sustained.

During the 1970s and early 1980s, P & G purchased "umbrella" liability insurance policies from several insurers. These policies included coverage for product liability claims. Unlike insurance policies that require the insurer to defend litigation against an insured, these policies were indemnity policies. They provided that P & G would defend itself and then would be

---

1. We collectively refer to Procter & Gamble Company, Procter & Gamble Manufacturing Company, and Procter & Gamble Distributing Company as Procter and Gamble (P & G).

2. As of June 30, 1987, P & G had expended more than $80 million to defend and settle the Rely/Toxic cases.

reimbursed for defense and settlement costs, as well as any judgments entered against the company. P & G's umbrella products liability insurers included American Employers Insurance Company (American) and Commercial Union Insurance Company (Commercial). American issued two umbrella liability policies to P & G, one for injuries sustained during the period July 1, 1972 to July 1, 1975, and one for injuries sustained during the period July 1, 1975 to July 1, 1978. Each American policy provided $50 million in coverage in excess of "underlying insurance" (primary insurance). The policies also were in excess of "underlying limits" (analogous to, and will be referred to as, a deductible) of $500,000 both per "occurrence" *and* in the aggregate. Commercial, an affiliate of American, issued an umbrella liability policy to P & G for injuries sustained during the period July 1, 1978 to July 1, 1979. For product liability, the policy provided $25 million in coverage in excess of primary insurance. The policy also was in excess of $1 million deductible subject to an aggregate annual deductible of $10 million.

In response to scientific reports linking P & G's Rely tampons to Toxic Shock Syndrome, P & G withdrew the tampons from the market in September 1980. At that time, the management of P & G realized that the company faced a serious product liability problem. The product had been manufactured and marketed from the mid–1970s to early 1980, and P & G eventually turned to the insurance companies that issued product liability policies during this period.

### B. *Procedural Posture*

#### 1. The parties and their contentions

Commercial originally was brought into this litigation by another P & G insurer, Northbrook Excess and Surplus Insurance Company (Northbrook). In its amended complaint, Northbrook alleged that it had issued umbrella liability insurance policies to P & G for periods from July 1, 1979 to July 1, 1981, and that P & G had submitted to Northbrook claims for reimbursement of

expenditures in defending and settling the Rely/Toxic cases. Northbrook denied liability coverage, but entered into a nonwaiver-interim agreement pursuant to which it had paid a portion of the P & G claims. The complaint asked the court for an order directing P & G to return all sums paid under that interim agreement and a declaration that Northbrook had no obligation to reimburse P & G for any Rely/Toxic defense claims in the future.

Northbrook named Commercial as a defendant in this litigation because of two previous *primary* insurance policies issued by Commercial to P & G, one in 1977 and one in 1980.[3] Northbrook contended that, even if P & G was entitled to reimbursements from Northbrook, P & G was first required to exhaust lower levels of insurance such as those *primary* policies provided by Commercial. Accordingly, Northbrook asserted that Commercial should indemnify Northbrook for any reimbursements it was required to pay P & G, up to the amount of Commercial's primary insurance coverage.

P & G answered Northbrook's amended complaint and asserted a counterclaim. Moreover, P & G advanced a crossclaim against Commercial and American. P & G alleged that Northbrook, Commercial, and American all had issued umbrella insurance policies, which insured P & G against product liability judgments and defense-related expenditures, and that the insurers were obligated to reimburse P & G for its insured losses. The present appeal deals with this crossclaim and focuses on the extent of Commercial's liability to P & G.

Approximately seventy-five to eighty claims fell within the Commercial umbrella policy period. However, only one of these cases exceeded $1 million. P & G and Commercial disagreed about the proper deductible amount under the Commercial policy: P & G claimed that there was a $1 million deductible per policy year; Commercial maintained that the applicable deductible was $10 million per policy year and $1 million "per occurrence." The parties'

---

**3.** These are not the umbrella policies of Commercial discussed earlier.

central disagreement concerned the proper definition of "occurrence." Commercial contended that the Rely/Toxic claims and lawsuits constituted multiple occurrences, and the deductible of $10 million applied. In contrast, P & G argued that the Rely/Toxic claims were a single occurrence, and the applicable deductible was $1 million.[4]

### 2. The jury verdict

The jury returned a special verdict. It found that, under the Commercial and Northbrook umbrella policies, the Rely/Toxic lawsuits and claims involved multiple "occurrences." Consequently, P & G's deductible was $10 million per policy year. Based on that verdict, the district court entered judgment. It directed Northbrook to reimburse P & G over $2 million for certain Rely/Toxic defense expenditures recorded through June 1987. Neither Northbrook nor P & G has appealed that judgment. Because P & G's reimbursable expenses attributable to injuries sustained during the policy year covered by the Commercial policy were less than the $10 million aggregate deductible, Commercial was ordered to reimburse P & G $40,000, the amount attributable to the one injury which exceeded the $1 million per "occurrence" deductible. American was ordered to reimburse P & G $5,500 for expenses attributable to its policy years. The district court also dismissed Northbrook's complaint against Commercial. P & G filed a timely notice of appeal challenging the judgment of the district court in favor of Commercial.

## II

## ANALYSIS

### A. *Jury Instruction*

#### 1.

Both P & G and Commercial agree that the central issue on appeal is the proper method of calculating P & G's deductible under the Commercial umbrella policy. Because our jurisdiction is based on diversity of citizenship, *see* 28 U.S.C. § 1332, state substantive law must govern the rights and liabilities of the parties. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see generally Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties agree that the applicable law is the law of Ohio. Therefore, we must apply Ohio rules of insurance contract construction.

The district court concluded that the policy terms were ambiguous. Having determined there were ambiguities, the district court properly left the issue of policy construction to the jury. *See Apponi v. Sunshine Biscuits, Inc.*, 652 F.2d 643, 651 n. 12 (6th Cir.1981) (quoting the Supreme Court of Ohio, court noted that " 'it is the province of the jury to ascertain and determine the intent and meaning of the contracting parties in the use of uncertain or ambiguous language' "). The jury resolved the ambiguities (whether the deductible was $1 million or $10 million per policy year and how many "occurrences" were involved) in favor of Commercial.

P & G concedes that the district court properly submitted to the jury the question of ambiguities. However, it contends that the court committed reversible error when it refused to instruct the jury that P & G was entitled to have the policy construed in any reasonable manner that afforded coverage. P & G's proposed jury instruction read:

In an insurance contract, any ambiguity as to the extent of coverage, particularly where ambiguity is in words chosen by the insurer, is interpreted in favor of the insured [Procter & Gamble]. In

---

**4.** P & G's general counsel summarized P & G's interpretation of the term "occurrence" at trial:

The Rely episode consisting of the design of a new and unique product, the marketing of that product, and association of that kind of product, tampons, with a new, really unknown disease called Toxic Shock Syndrome, and then the association in the statistical studies that I have described of Rely particularly with that disease, followed by the withdrawal from the market, the reverse marketing that I talked about, and literally over 1,000 claims and lawsuits was one occurrence.

Tr. I at 215.

other words, a reasonable construction of the policy that affords coverage for Procter & Gamble should be adopted. Appellants' App.Ex. 8. The instruction is based upon the principle of *contra proferentum:* "an ambiguous provision is construed most strongly against the person who selected the language." Black's Law Dictionary 296 (5th ed. 1979); *see United States v. Seckinger,* 397 U.S. 203, 216, 90 S.Ct. 880, 887, 25 L.Ed.2d 224 (1970). The district court reasoned that the Commercial policy was not a contract of adhesion, a prerequisite necessary to invoke such an instruction, and believed the instruction would require the jury to ignore the intention of the parties in negotiating and drafting the Commercial policy. Therefore, the district court instructed the jury as follows:

> The issue for your decision is not whether there were contracts but, rather, what meaning the parties intended by the terms of the contracts. You must decide from a consideration of all the facts and circumstances in evidence what the various insurance policies mean with respect to the terms used. You must decide what parties mutually intended when they entered into the contracts.
>
> ....
>
> In dealing with the differing positions as to the meaning of various terms in the insurance contracts, you will decide what of parties [sic] intended the terms to mean, considering all the facts and circumstances in evidence, including any evidence about the use of the terms in the commercial insurance world.

Tr. XI at 3155–56.

2.

■ As a threshold matter, the proposed instruction must correctly state the law before P & G is entitled to contest the district court's refusal to use it. *See United States v. McNeese,* 901 F.2d 585, 609 (7th Cir.1990); *Higgins v. White Sox Baseball Club, Inc.,* 787 F.2d 1125, 1129 (7th Cir.1986). Moreover, we shall not reverse the court's decision to give or to deny any particular jury instruction unless, " 'considering all the instructions, the evidence and the arguments,' it appears that 'the jury

was misled ... [and its] understanding of the issues was seriously affected to the prejudice of the complaining party.' " *Roggow v. Mineral Processing Corp.,* 894 F.2d 246, 249 (7th Cir.1990) (quoting *Simmons v. Pinkerton's, Inc.,* 762 F.2d 591, 597 (7th Cir.1985)).

■ In our view, the district court committed no error in instructing the jury. While the instruction proffered by P & G states correctly an abstract principle of law, that principle does not govern the disposition of this case. Ohio follows the general rule that ambiguous terms in insurance contracts are construed strictly against their authors and liberally in favor of the insured. *See, e.g., King v. Nationwide Ins. Co.,* 35 Ohio St.3d 208, 519 N.E.2d 1380, 1383 (Ohio 1988); *Gomolka v. State Auto. Mut. Ins. Co.,* 70 Ohio St.2d 166, 436 N.E.2d 1347, 1352 (Ohio 1982). However, it is clear that the rule is grounded in the need to protect an insured from an insurer who has had exclusive control of the drafting process. That concern is not implicated here.

■ Insurance contracts are construed strictly in favor of the insured because, usually, the insurer wrote the policy terms. As a leading treatise notes:

> It is commonly stated that the reason for the rule of construction against the insurer is that policies of insurance are made on printed forms carefully prepared in the light of wide experience, by experts employed by the insurer, and in the preparation of which *the insured has no voice....*
>
> Additionally, these contracts are usually offered to the insured on a take-it-or-leave-it basis and as such are termed contracts of adhesion, justifying a construction against the insurer.

Couch on Insurance 2d 382–83, 387, § 15:78 (rev. ed. 1984) (emphasis supplied). Ohio clearly embraces this rationale. For example, in *Gomolka,* the Ohio Supreme Court noted that "[t]he insurer, *having prepared the policy,* must also be prepared to accept any reasonable interpretation ... in favor of the insured." 436 N.E.2d at 1348 (em-

phasis supplied).[5] However, Ohio also follows the cardinal rule of contracts law that the document is to be enforced according to the intent of the parties. *See Apponi,* 652 F.2d at 651 n. 12; *Gomolka,* 436 N.E.2d at 1348. Therefore, we can assume that—like other jurisdictions [6]—Ohio would not apply the *contra proferentum* principle to situations in which its underlying rationale is inapplicable.

 The record clearly establishes that P & G was a co-drafter of the Commercial policy and not simply a party given a take-it-or-leave-it option. As the district court noted:

> The policies could be and to a considerable extent were tailormade. Whether P & G's people were as sophisticated as they could have been, that's an argument as far as I am concerned to the jury, but

they had an insurance department, they had lawyers, they had sophisticated retailers with lots of experience in Jack Trainer, and they certainly had the economic muscle to get or at least push for what they wanted.

Tr. XI at 3186. There was substantial evidence [7] to support the conclusion that the final Commercial policy was profoundly more than a standard insurance policy; indeed, significant portions of the policy's language were customized at P & G's insistence. Thus, contrary to P & G's assertion, the district court did not err in rejecting the *contra proferentum* jury instruction. Such an instruction would have required the jury to ignore the parties' intent and apply a doctrine of contract construction inapplicable to the present case.[8]

5. *Accord Tomlinson v. Skolnik,* 44 Ohio St.3d 11, 540 N.E.2d 716, 719 (Ohio 1989) (quoting *Gomolka* ); *Suburban Community Hosp. v. Lindquist,* 69 Ohio St.2d 302, 432 N.E.2d 173, 175 (Ohio 1982) (" 'A contract of insurance *prepared and phrased by the insurer* is to be construed liberally in favor of the insured....' ") (emphasis supplied) (quoting *Munchick v. Fidelity & Cas. Co.,* 2 Ohio St.2d 303, 209 N.E.2d 167, 169 (Ohio 1965)); *Butche v. Ohio Cas. Ins. Co.,* 174 Ohio St. 144, 187 N.E.2d 20, 22 (Ohio 1962) ("[P]olicies of insurance, *which are in language selected by the insurer* and which are reasonably open to different interpretations, will be construed most favorably for the insured.") (emphasis supplied); *Taulbee v. Travelers Cos.,* 42 Ohio App.3d 209, 537 N.E.2d 670, 673 (Ohio Ct.App.1987) ("Where a contract is *prepared by the insurer* and includes language which is doubtful, vague, or ambiguous, it is axiomatic that the language is to be construed in favor of the insured and strictly against the insurer.") (emphasis supplied).

6. *See, e.g., Eastern Associated Coal Corp. v. Aetna Cas. & Sur. Co.,* 632 F.2d 1068, 1075 (3d Cir.1980) (applying Pennsylvania law) ("[T]he principle that ambiguities in policies should be strictly construed against the insurer does not control the situation where large corporations, advised by counsel and having equal bargaining power, are the parties to a negotiated policy."); *Industrial Risk Insurers v. New Orleans Pub. Serv., Inc.,* 666 F.Supp. 874, 881 (E.D.La.1987) ("The general rule that ambiguous provisions should be strictly construed against the insurer does not apply in this case where the insured, a large municipality, was represented by professionals, including the Insurance Advisory Committee, ... the City Attorney and an experienced insurance agent. The City stood on an equal footing with its insurers and had significant

input in negotiating the terms of the policy. Thus, ambiguous provisions should be construed in favor of what reason and probability dictate was intended by the parties."); *McNeilab, Inc. v. North River Ins. Co.,* 645 F.Supp. 525, 547 (D.N.J.1986) ("Concededly, a sophisticated insured, Johnson & Johnson cannot seek refuge in the doctrine of *contra proferentum* " when "the policy itself was negotiated [by Johnson & Johnson], as were almost all of 15 addenda to the policy, most of which added or subtracted specific form coverages over the year."), *aff'd,* 831 F.2d 287 (3d Cir.1987); *see generally Liverpool & London & Globe Ins. Co. v. Kearney,* 180 U.S. 132, 135–36, 21 S.Ct. 326, 327–28, 45 L.Ed. 460 (1901) (contra-insurer rule "rests upon the ground that the company's attorneys, officers or agents, prepared the policy, and it is its language that must be interpreted"); Couch on Insurance 2d 389, § 15:79 (rev. ed. 1984) ("The policy is not to be construed strictly against the insured when the language in question was supplied by the insured or by his broker.").

7. For example, one of P & G's brokers, in a letter to Jack Trainer, P & G's agent in negotiating the Commercial policy, said, "There is no question that at present [Commercial] has a broader form than [Northbrook], but then it should be, because I think you [Trainer] wrote it." Tr. VIII at 2234.

8. P & G's heavy reliance on *Owens–Illinois, Inc. v. Aetna Cas. & Sur. Co.,* 597 F.Supp. 1515 (D.D.C.1984) (applying Ohio law), for its position that *contra proferentum* is a rule of insurance contract construction to be applied against the insurer regardless of the insured's extensive participation in the drafting process, is misplaced. The *Owens–Illinois* court adopted the

## B. *Prejudgment Interest*

In addition to seeking reimbursement for expenses it incurred, P & G asked for prejudgment interest and asserted that the jury should determine whether interest should be awarded. The district court did not submit the prejudgment interest issue to the jury. Instead, the court postponed a determination of any interest award until after the jurors returned their verdict on the questions submitted to them. After the jury decided that the applicable deductible was $10 million under the Commercial policy, the court did not award prejudgment interest.

"In diversity cases, the allowance of prejudgment interest is governed by state law." *Fort Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1383 (7th Cir.1990). Ohio provides by statute for prejudgment interest:

> [W]hen money becomes due and payable upon any ... instrument in writing ... for the payment of money arising out of ... a contract or other transaction, the creditor is entitled to interest at the rate of ten percent per annum....

Ohio Rev.Code § 1343.03(A). P & G contends that under Ohio law, the jury determines the applicability of prejudgment interest. It further claims that the amount was sufficiently ascertainable to permit the award of prejudgment interest.

██ We need not delve into the intricacies of Ohio law with respect to the allocation of responsibility between court and jury in the award of prejudgment interests. Under Ohio law, an award of prejudgment interest is not always required. *See Horn-*

*ing–Wright Co. v. Great Am. Ins. Co.*, 27 Ohio App.3d 261, 500 N.E.2d 890, 893 (Ohio Ct.App.1985) (if "dispute is over liability itself and the amount of such potential liability is not in dispute or is readily ascertainable" court or jury should grant prejudgment interest to prevailing plaintiff); *Shaker Savs. Ass'n v. Greenwood Village, Inc.*, 7 Ohio App.3d 141, 454 N.E.2d 984, 986 (Ohio Ct.App.1982) ("to avoid prejudgment interest, the debt must be unascertainable"); *Braverman v. Spriggs*, 68 Ohio App.2d 58, 426 N.E.2d 526, 527 (Ohio Ct. App.1980) ("running of interest ... is delayed only where the amount is unliquidated"); *Clevenger v. Westfield Cos.*, 60 Ohio App.2d 1, 395 N.E.2d 377, 379 (Ohio Ct.App.1978) ("If judgement can be determined only by the reasonable judgment of the jury ... the jury should not be charged to return prejudgment interest"). In *Horning–Wright*, the court concluded that prejudgment interest should have been granted as a matter of law only because the parties disputed whether the debt was owed, not the amount of the debt. 500 N.E.2d at 893. Here, in contrast, the amount owed was certainly disputed.[9] Although P & G may be correct that the amounts it expended in defending the Rely/Toxic claims were liquidated or reasonably determinable, the *debt* owed by Commercial was unascertainable until the jury determined the meaning of the policy provisions (including the amount of the deductible and the number of occurrences). *See Worrell v. Multipress, Inc.*, 45 Ohio St.3d 241, 543 N.E.2d 1277, 1285 (Ohio 1989).[10] The district court's decision to

"reasonable expectations" doctrine in reaching its holding. The reasonable expectations doctrine has been soundly rejected by Ohio courts, and thus, the rationale of *Owens–Illinois* is contrary to Ohio law. *See Sterling Merchandise Co. v. Hartford Ins. Co.*, 30 Ohio App.3d 131, 506 N.E.2d 1192, 1196–97 (Ohio Ct.App.1986).

**9.** Throughout this litigation the parties have disputed the *amount* of certain Rely/Toxic litigation claims submitted to Commercial by P & G. Indeed, Commercial challenged the amount that P & G allocated to the one case that pierced the $1 million deductible. Commercial disapproved of P & G's allocating a double portion of general expenses and a percentage of case spe-

cific and general expenses that never specified an occurrence date. The parties finally stipulated to an allocable amount, but this was after the trial had ended and the jury returned its verdict. Furthermore, at trial, P & G admitted that some of the claims submitted to its insurers required downward adjustments to more accurately reflect actual expenditures.

**10.** *Accord Eagle–Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 829 F.2d 227, 248–49 (1st Cir.1987) (applying Ohio law) (The court rejected a prejudgment interest argument in a case involving insurance coverage for asbestos-related liability because, "[w]hat has not been settled until our decision today, however, is which of those

withhold prejudgment interest from P & G was proper.

## C. Costs

### 1. Prevailing party

■ After the jury returned its verdict and the district court entered judgement, P & G sought to recover its costs and expenses pursuant to Federal Rule of Civil Procedure 54(d). P & G asserted that it was the prevailing party against Commercial, but indicated to the court its willingness to accept a determination that neither it nor Commercial prevailed. Commercial disagreed and contended that it had prevailed against P & G and was entitled to costs. The district court agreed with Commercial and awarded its costs. The court reasoned that the most significant single issue in the litigation was whether the Rely/Toxic claims and lawsuits constituted a single occurrence or multiple occurrences. Relying on *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1015 (7th Cir.1985), and *Best Medium Publishing Co. v. National Insider, Inc.*, 385 F.2d 384, 386 (7th Cir.1967), *cert. denied*, 390 U.S. 955, 88 S.Ct. 1052, 19

L.Ed.2d 1150 (1968), the district court concluded that Commercial "clearly prevailed" on a substantial part of the litigation in light of the jury's ruling against P & G on the occurrence issue and, thus, on the largest expense item. The court noted, "in the context of this case [Commercial's] liability was nominal." R. 673 at 4. On appeal, P & G again contends that it was the prevailing party. The thrust of P & G's argument is that, although the lawsuit yielded less than P & G had hoped to recover, judgment was entered in its favor and that entitles P & G to prevailing party status. We apply a deferential standard of review to the district court's conclusion and will not overturn it absent an abuse of discretion. *See Shepard v. Sullivan*, 898 F.2d 1267, 1271 (7th Cir.1990).

■ In *First Commodity*, this court determined that "under Rule 54(d) the 'prevailing party' is the party who prevails 'as to the substantial part of the litigation.' " 766 F.2d at 1015 (quoting *Best Medium Pub. Co. v. National Insider, Inc.*, 385 F.2d 384, 386 (7th Cir.), *cert. denied*, 390 U.S. 955, 88 S.Ct. 1052, 19 L.Ed.2d 1150 (1967)).[11] There was a single significant

claims properly belong within AMICO's policy coverage. It can not reasonably be argued that AMICO's obligation could be determined by 'mere computation' or 'reasonably certain calculations' until we ruled on how one is to determine when a disease is reasonably capable of medical diagnosis. Until now, it was unclear which claims would become AMICO's responsibility."); *Mahon–Evans Realty Inc. v. Spike*, 33 Ohio App.3d 268, 515 N.E.2d 953, 956 (Ohio Ct.App.1986) ("Until, and only until, the trial court finally resolved the existing ambiguity, did the amount of the debt become known. The amount of the debt was not ascertainable by reference to the language of the contract. As long as the proper amount of the commission remained undetermined, it was a choice between two different figures and it was not ascertainable or liquidated. Where the trial testimony amply demonstrated that both parties to the contract held different views as to the amount owing, and where the amount could not be determined by mere reference to the parties' agreement, the debt is unliquidated.").

**11.** P & G invites our attention to *Texas State Teachers Association v. Garland Independent School District*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). In that case, the Supreme Court examined the meaning of "prevailing par-

ty" within the context of a claim for attorney's fees under 42 U.S.C. § 1988. *Garland* announced a broad test applicable to the civil rights area, in which Congress intended that the plaintiff serve as a "private attorney general." In *Garland,* the Court held that, "[i]f the plaintiff has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit' the plaintiff has crossed the threshold to a fee award of some kind." *Id.* at 1493 (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)). P & G places great reliance on the Court's subsequent language. "Thus, at a minimum, to be considered a prevailing party ... the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Id.* P & G claims that it altered the legal relationship between itself and Commercial because prior to trial, Commercial "steadfastly denied owing P & G as much as one penny," Appellants' Br. at 16, and as a result of the trial, Commercial will pay P & G thousands of dollars. We are not persuaded by P & G's reasoning. Even if *Garland* did control here, we believe our conclusion is supported by the Court's comments in *Garland* stated just after the language relied upon by P & G: "Where the plaintiff's success on a legal claim can be characterized as purely technical

issue in this case: whether the Rely/Toxic cases constituted a single occurrence or multiple occurrences within the meaning of the Commercial policy. Resolution of that question determined whether P & G's deductible was $1 million or $10 million. Although, as P & G contends, Commercial was found to have some liability, Commercial prevailed on the resolution of this central issue. The jury determined that the deductible amount was $10 million and that the Rely/Toxic cases were multiple occurrences. Therefore, we agree with the district court that the $45,500 recovered from Commercial ($40,000 under the Commercial policy and $5,500 under the American policy) was nominal when compared to the more than $5 million in claims asserted by P & G.[12] The district court did not abuse its discretion when it determined that P & G did not prevail as to a "substantial" part of the litigation, that P & G's recovery was *de minimis*, and that P & G therefore could not be deemed the prevailing party.

### 2. Costs awarded to Commercial

P & G objected to Commercial's initial bill of costs. The district court ordered Commercial to file an amended bill of costs and ultimately awarded Commercial $97,-463.16 in costs. Commercial's bill of costs included various expenses associated with the trial including photocopying costs, expenses for photos, graphs, and charts used at trial, and costs for preparation and entry of a computer data base for the case. P & G opposed, in varying degrees, the amounts allocated to these categories of expenses. Specifically, P & G asserted that the photocopying expenses lacked proper documentation to ascertain whether the majority of the charges were proper; the Rely/Toxic case data base was not taxable as a cost under Rule 54(d) and also

lacked proper documentation; and the photo, graphs, and charts expenses were not taxable and were not necessary for use at trial.

■■■ Our course in reviewing an award of costs is well chartered. Under Rule 54(d), district courts enjoy wide discretion in determining and awarding reasonable costs. *See Weihaupt v. American Medical Ass'n,* 874 F.2d 419, 430 (7th Cir. 1989). The court's discretion, however, is not unfettered. In order to award costs to a prevailing party, the court must determine that the expenses are allowable cost items and that the amounts are reasonable and necessary. *See id.* As long as statutory authority exists for a particular item to be taxed as a cost, we shall not overturn a district court's determination that the cost is reasonable and necessary, absent a clear abuse of discretion. Thus, we shall review carefully whether an expense is recoverable, but once we determine that it is, we defer to the district court, which is in the best position to determine whether the cost is reasonable. *See SK Hand Tool Corp. v. Dresser Indus., Inc.,* 852 F.2d 936, 943 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3241, 106 L.Ed.2d 589 (1989).

The district court's source for taxing costs is Rule 54(d), which reads in relevant part:

> Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs....

Fed.R.Civ.P. 54(d). Under 28 U.S.C. § 1920, a federal court may tax as costs:

(1) Fees of the clerk and marshal;

---

or *de minimis,* a district court would be justified in concluding that even the 'general formulation' we adopt today has not been satisfied." 109 S.Ct. at 1493. As noted in the text, Commercial not only prevailed on the one issue in the case, but P & G's recovery was "nominal" when compared to the claims asserted by it.

**12.** In *First Commodity,* we said, "When awarding fees pursuant to Rule 54(d), 'courts must

give considerable attention to the "relationship between the extent of success and the amount of the fee award," ... especially when the plaintiff has succeeded on only some of her claims.'" 766 F.2d at 1015 (quoting *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1281 (7th Cir.1983) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 438, 103 S.Ct. 1933, 1942, 76 L.Ed.2d 40 (1983))). Thus, it is clear to us that P & G's recovery from Commercial was *de minimis.*

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

. . . .

The Supreme Court has determined that section 1920 "defines the term 'costs' as used in Rule 54(d)." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441, 107 S.Ct. 2494, 2497, 96 L.Ed.2d 385 (1987). We have held, however, that under *Crawford*, the "Supreme Court did not 'prevent courts from interpreting the meaning of the phrases used in § 1920.'" *SK Hand Tool*, 852 F.2d at 944 (quoting *West Wind Africa Line, Ltd. v. Corpus Christi Marine Servs.*, 834 F.2d 1232, 1238 (5th Cir. 1988)). With these principles in mind, we now discuss each of the challenged costs in turn.

a. photocopying expenses

 P & G first charges that the photocopying expenses lacked proper documentation to determine whether the expenses were necessary. Specifically, P & G asserts that Commercial failed to identify any document copied, the number of copies made of each original, or the copying cost per page. Of course, Commercial was not required to submit a bill of costs containing a description so detailed as to make it impossible economically to recover photocopying costs. Rather, Commercial was required to provide the best breakdown obtainable from retained records. *See Levka v. City of Chicago*, 107 F.R.D. 230, 231 (N.D.Ill.1985). Based on the records submitted by Commercial, the dis-

trict court specifically concluded that Commercial's "documentation establishes that these were copies made for this case for its attorneys and billed in the normal course with the documents coming in. . . ." Tr. of August 23, 1989 at 4. The court realized that a copying bill of more than $50,000 was large, but found that it was not excessive "in the context of a six-year paper war." *Id.* The court also found that the per copy price was reasonable. *Id.* Thus, unlike *Weihaupt*, in which the court "failed to make any findings" on whether the expenses awarded were allowable and reasonable to the litigation, 874 F.2d at 430–31, the district court in this case specifically made those findings. Therefore, we believe the district court was within its discretion in taxing costs for the photocopying expenses in the amount of $50,930.45.[13]

b. Rely data base

P & G next challenges the district court's award for Commercial's preparation and entry of the "Rely data base." P & G asserts that a "computerized litigation support system" is not recoverable under section 1920, or alternatively, Commercial failed to document the necessity of the data base. Commercial explains that the database was not a computerized litigation support system, but a system designed, in part, to reduce the time and expenses of reviewing documents, and reduce storage and duplication expenses, which are recoverable as a part of copying costs. The district court's comments on the subject are sparse. Contrary to its attentive findings relating to the photocopying expenses, the court simply concluded that the data base was a "less expensive substitute for otherwise recoverable costs." Tr. of August 23, 1989 at 5.

 As an initial matter, P & G is quite correct in arguing that expenditures for a computerized litigation support system are not taxable costs under section 1920. *See Chicago College of Osteopathic*

---

**13.** We have, on past occasions, upheld rather large photocopying costs produced as a result of long, paper intensive litigation. *See Brandt v.*

*Schal Assocs., Inc.*, 854 F.2d 948, 955 (7th Cir. 1988); *SK Hand Tool*, 852 F.2d at 944.

*Medicine v. George A. Fuller Co.*, 801 F.2d 908, 911–12 (7th Cir.1986) (dicta); *E.E.O.C. v. Sears, Roebuck & Co.*, 111 F.R.D. 385, 394–95 (N.D.Ill.1986). More fundamentally, even if this data base is not such a system, the data base's function that allegedly justifies its inclusion as a taxable cost (i.e., reduction of time and costs in reviewing documents, and reduction of storage and duplication expenses), does not necessarily warrant characterizing it as a substitute for an otherwise allowable cost.[14] In *E.E.O.C. v. Sears, Roebuck & Co.*, 114 F.R.D. 615 (N.D.Ill.1987), Sears attempted to recover charges for microfilm and microfilm rental equipment as taxable costs. Sears' proffered justification was much the same as Commercial's; it used the microfilm to reduce the expenses of reviewing documents and to reduce storage and duplication expenses. *Id.* at 625. The court disallowed the expense.

> [T]o the extent that Sears incurred the microfilm expenses in lieu of expenses for reviewing of documents, the microfilm expenses are not recoverable as copying costs. Also given the number of hard copies of most of the microfilmed documents that Sears has requested and the court has allowed, the court finds the microfilm expenses incurred in lieu of storage and duplication expenses unnecessary and for counsel's convenience.

*Id.* at 625–26. *See generally United States Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1245–46 (10th Cir.1988) (court rejected argument that expense of compiling a data base for computerized document analysis was a taxable exempli-

fying or copying expense under section 1920). The district court's one-sentence comment regarding the data base expense does not permit this court to determine whether the expense was reasonable and necessary under the principles discussed above. *See Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 430–31 (7th Cir. 1989). Accordingly, we vacate the award of costs for the preparation and entry of the data base and remand for further development of the record and more explicit findings by the district court.[15]

c. photos, graphs, and charts

■ P & G's final contention is that the district court improperly awarded costs for photos, graphs, and charts or, alternatively, that the costs were not necessarily incurred for use in the case. The district court specifically noted that, given the complex nature of the issues and the length of the trial, the photos, graphs, and charts were not only appropriate but necessary for the jury to understand the issues. Moreover, the court observed that all of the parties, including P & G, used these types of material at trial. We believe the district court was within its discretion in taxing these costs in the amount of $14,297.65. *See E.E.O.C. v. Kenosha Unified School Dist.*, 620 F.2d 1220, 1226 (7th Cir.1980) (section 1920(4) construed as permitting award for preparing maps, charts, graphs, photographs, motion pictures, photostats, and kindred materials); *Sears*, 114 F.R.D. at 625 (court may award costs for exhibits particularly in lengthy trials with complex issues).

---

**14.** We note that there appears to be no authority for recovery of storage costs pursuant to 28 U.S.C. § 1920. Cases that did permit recovery of storage costs were government seizure cases pursuant to 28 U.S.C. § 1921. Section 1921, unlike section 1920, specifically provides for the recovery of storage costs in seizure cases. *See, e.g., United States v. Various Slot Machines on Guam*, 658 F.2d 697, 701 (9th Cir.1981).

**15.** Our brother's dissent requires that we emphasize that we do *not* hold that the district court abused its discretion in awarding costs. We only require sufficient information to make our review meaningful. "Review under the abuse of discretion standard does not mean no appellate review." *In re Ronco, Inc.*, 838 F.2d

212, 217 (7th Cir.1988); *see also Mars Steel Corp. v. Continental Bank, N.A.*, 880 F.2d 928, 936 (7th Cir.1989) (en banc). Our disinclination to tolerate "rough justice" (dissent at 646) is grounded not, as the dissent rather uncharitably suggests, in "technophobia" but in a respect for the mandate of Congress embodied in 28 U.S.C. § 1920. Innovative applications of that statutory mandate necessarily require more explanation than prosaic ones. Consequently, the dissent's reliance on *S.K. Hand Tool Corp. v. Dresser Industries, Inc.*, 852 F.2d 936, 944 (7th Cir. 1988) is inapposite. The *Dresser* court awarded costs for deposition transcripts, an award, unlike the database costs at issue here, which is clearly permitted under section 1920.

### Conclusion

For the foregoing reasons, we affirm the judgment of the district court in all respects except for its ruling that the expenditures for preparation and entry of the Rely data base were a taxable cost under Rule 54(d). On that issue, we vacate the judgment and remand for further proceedings. Commercial Union and American Employers may recover their costs in this court.

AFFIRMED IN PART AND VACATED IN PART.

ESCHBACH, Senior Circuit Judge, dissenting in part.

I join in the well-reasoned majority opinion except as to the decision to vacate the District Court's award of $1,936.66 in costs for Commercial's document database. The District Court made a short but specific, factual finding—that Commercial's computerized document system was a "less expensive substitute" for otherwise recoverable costs. Nothing in the record contradicts this finding, and, in the context of a "six year paper war," the finding makes sense. This finding is neither insufficient nor an abuse of discretion.

The majority simply misapplies the pertinent case law. Reasonable costs are recoverable under 28 U.S.C. § 1920 if they (1) are of the kind listed in that provision and (2) if they are in fact necessary for the particular litigation. *See, e.g., SK Hand Tool Corporation v. Dresser Industries,* 852 F.2d 936, 943–44 (7th Cir.1988). The cases that the majority cites focus only on the second element—finding on their particular facts that the costs at issue were *not* necessary. *See Equal Employment Opportunity Comm'n v. Sears, Roebuck & Co.,* 114 F.R.D. 615, 625–26 (N.D.Ill. 1987) (finding that the microfilm document storage system at issue was not necessary because the party using the system had made hard copies of most of the micro-

filmed documents anyway); *see also United States Industries v. Touche Ross & Co.,* 854 F.2d 1223, 1246 (10th Cir.1988) (stating that the "primary issue" on appeal was whether the costs of a computerized document system "were necessarily incurred in the litigation" and affirming the district court's denial of costs). These cases provide no basis for the majority to take issue with the District Court's finding in the present case that the computerized document system at issue *was* necessary and *reduced* total recoverable costs.[1]

The majority also relies on *Weihaupt v. American Medical Association,* 874 F.2d 419 (7th Cir.1989) to suggest—quite erroneously—that the District Court's specific but brief finding on the question of these costs is inadequate for our review. In *Weihaupt,* this Court vacated an award because the district court had "failed to make *any* findings on, and thus we are unable to review, whether the expenses [at issue] ... were allowable, much less determine whether they were reasonable in amount and necessity." *Id.,* at 430–431 (emphasis added). Again, the District Court here not only concluded that the costs were allowable, but that they reduced the total allowable costs, and so can hardly raise any issue of reasonableness in amount or necessity. What more do we require? Without question, this finding is adequate under our case law. *See, e.g., SK Hand Tool Corporation v. Dresser Industries, Inc.,* 852 F.2d 936, 944 (7th Cir.1988) (holding that the district court's mere statement that costs were "reasonably incurred", with no indication of how it determined those costs, was sufficient).

Further, vacating the District Court's award is pure waste. The $1,936.66 in dispute is about what it will cost the parties and the taxpayers to hold a further evidentiary hearing on this matter. Ironi-

---

1. The majority also makes an oblique reference to a rhetorical flourish from one of this Court's opinions. In *Chicago College of Osteopathic Medicine v. George A. Fuller Co.,* 801 F.2d 908, 911–12 (7th Cir.1986), the Court asked: "if expert-witness fees can be awarded as costs when the services bought with them are 'necessary' or 'crucial,' why not the costs of a computerized document-retrieval system, or of paralegals, or for that matter of attorneys?" The Court's point was that "necessity" is not enough by itself to support an award of costs, which is quite correct. The Court was not suggesting that awarding costs for a computer system that reduced otherwise recoverable costs would present any legal difficulty.

cally, the sole purpose of this further evidentiary hearing is to support still more legal proceedings—to allow this Court to conduct a more searching review in a second appeal than it can perform on the current record. This second appeal will never take place, of course, and the odds are that the further evidentiary hearing will not either. One of the parties, most likely Commercial, will abandon the issue. This abandonment will not have anything to do with the merits, it will simply reflect that this Court has made it uneconomical to obtain a judgment. The District Court may well have done rough justice in its brief finding, but the majority substitutes a result that has nothing to do with justice.

The best explanation for the majority's disregard of the economics of this issue and its *de facto* disregard of the abuse of discretion standard may be technophobia. The use of computer databases to reduce the amount of paper that cases generate is still a relatively recent development. It is understandable that appellate courts will tend to look more closely (and will be quick to remand for further findings) when faced with new substitutes for old ways. Understandable yes, desirable no. Technology will march on regardless, but every disincentive slows its advance at least to some extent. This is distressing because our overburdened courts and litigation-weary parties can ill afford to wait for advances that will allow them to do their jobs better and at less cost. We hardly do justice by penalizing Commercial because of its use of innovation.

In short, the majority has no basis for concluding that the District Court abused its discretion or made insufficient findings in awarding costs for the document database. The case law that the majority cites is not on point, the amount of money in dispute will not support the expense that the majority's remand imposes, and sound policy speaks against an appellate court casting a suspicious eye at the award of costs to a party who uses new, less expensive ways of performing tasks that are traditionally compensable. For these reasons, I dissent from that portion of the majority's decision vacating the award of costs for the computer database.