**SK HAND TOOL CORPORATION and Corcoran Partners, Ltd., Plaintiffs–Appellants,**

v.

**DRESSER INDUSTRIES, INC., Defendant–Appellee.**

Nos. 87–2294, 87–3067.

United States Court of Appeals, Seventh Circuit.

Argued April 18, 1988.

Decided July 18, 1988.

Frederic F. Brace, Jr., Chicago, Ill., for plaintiffs-appellants.

Stephen C. Bruner, Winston & Strawn, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, CUDAHY and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

Plaintiffs, Corcoran Partners and its subsidiary, SK Hand Tool Corporation ("Corcoran"), appeal the dismissal of Count IV of their third amended complaint. Count IV alleges that Dresser Industries ("Dresser") violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, in committing various acts of mail and wire fraud in furtherance of a scheme to overstate the value of its hand tool division.[1] The district court dismissed this count pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim because Corcoran had failed to allege that Dresser had engaged in a "pattern of racketeering

---

**1.** Corcoran seeks to recover treble damages under 18 U.S.C. § 1964(c) for Dresser's alleged RICO violations, *id.* § 1962(a)–(c).

Under section 1962(a), it is illegal for any person who has received income derived from a pattern of racketeering activity to use any part of it to acquire an interest in, or to operate, an enterprise engaged in interstate commerce. Corcoran alleges that Dresser violated section 1962(a) by receiving income from the sale of the division through a pattern of racketeering activ-

ity and using that income in the operation of the company.

Corcoran also alleges that Dresser violated section 1962(b), which prohibits a person from gaining or maintaining an interest in any interstate enterprise through a pattern of racketeering activity. Dresser also allegedly violated section 1962(c), which prohibits any person associated with any interstate enterprise from conducting the affairs of that enterprise through a pattern of racketeering activity.

activity," a prerequisite to RICO liability. Corcoran also appeals the district court's award of costs to Dresser. Dresser, in turn, asks us to impose sanctions on Corcoran for undertaking allegedly frivolous appeals. We affirm and deny sanctions on appeal.

## I.

In reviewing the dismissal of a civil RICO complaint, this court construes all allegations as true and views them in a light most favorable to the plaintiff. *Morgan v. Bank of Waukegan*, 804 F.2d 970, 973 (7th Cir.1986). Hence, we describe the facts as alleged by Corcoran in its third amended complaint.

Dresser is a large manufacturing company in Dallas with a hand tool division located in Chicago. Perhaps because the division was losing money, certain Dresser employees who managed it embarked on a scheme to conceal its true financial condition from Dresser officers and directors, as well as from the investing public. Although the complaint does not indicate how the employees managed this deception, Corcoran has elsewhere explained that various accounting practices were followed enabling the hand tool division effectively to borrow from the future to reduce its current losses. The complaint does not explain who devised the scheme, who was aware of it nor who remained uninformed.

In 1983, Dresser decided to sell its hand tool division to Corcoran. To this end, Rex Sebastian, Dresser's Senior Vice President of Operations in Dallas, spoke several times by telephone with William Downey, President of Dresser's Tool Group in Chicago, about Corcoran's letter of intent to purchase the division, Dresser's letter of intent to sell and the division's warranty liability. It is uncertain whether Sebastian was thereby informed of the scheme to overstate the value of the division. The complaint suggests that he may not have been aware of the division's true value.

On August 4, 1983, after speaking with Downey, Sebastian called Thomas Corcoran, one of Corcoran's principal partners, in Chicago to discuss the terms of the sale of the division. Five days later, Corcoran called Sebastian to inform Dresser that his partnership agreed to the terms and would proceed with the transaction. The parties agreed to base the price of the division on the numbers shown on the Effective Date Balance Sheet. Beginning in September 1983, Daniel Czuba, another principal partner in Corcoran, sought additional information about the division. During this investigation, Dresser employees blatantly misrepresented the division's financial condition in furtherance of their scheme. Czuba asked Downey about the liabilities associated with outstanding "lifts" to which the division was committed.[2] Downey falsely replied, "Practically nothing." In fact the division had about $1.3 million in lift obligations, $1 million of which Downey had personally approved.

In October 1983, John Macauley, Controller of the Tool Group, told Czuba that the division's accounting practices differed from Generally Accepted Accounting Principles ("GAAP") only with respect to intracompany transfers, even though he knew that the division's accounting practices differed drastically from GAAP in a number of areas, none of which involved intracompany transfers. Czuba then asked Macauley for a list of the division's obsolete inventory. Although Macauley did not let Czuba see the list, he promised to furnish accurate figures of the obsolete inventory. The figures he provided, however, were inaccurate, since two items had been improperly removed from the list. In addition, George Fansmith, Controller of the division, told Czuba that the division had accrued a liability for cooperative advertising allowance, but such an accrual was not included as a liability on the division's balance sheet.

On October 10, Dresser mailed Corcoran a draft of the purchase agreement. On December 13, Dresser mailed Corcoran the

---

**2.** "Lifts" are a means for a manufacturer to obtain shelf space for its product by extending purchase credit to a wholesaler or retailer who agrees to deplete his inventory of products of the manufacturer's competitors and to buy the manufacturer's products.

final Effective Date Balance Sheet, on the basis of which the purchase price would be set. Paragraph 3.2 of the Purchase Agreement stated that the Effective Date Balance Sheet would "fairly present in all material respects the asset values and liabilities for the items reflected thereon as of the Effective Date." The Effective Date Balance Sheet, however, did not in fact fairly present the division's assets and liabilities, and Dresser allegedly knew this. As a result, the closing purchase price was overstated.

Realizing it had paid too much for Dresser's hand tool division, Corcoran, pursuant to the purchase agreement, submitted its claim to arbitration. Unhappy with the arbitrator's determination that it had overpaid Dresser by only $1.386 million, Corcoran brought an action in district court alleging fraud, breach of contract and RICO violations. With respect to the RICO count, Corcoran charged that Dresser had profited from a pattern of racketeering activity by engaging in various acts of mail and wire fraud that were committed in furtherance of a scheme (originally designed to deceive Dresser officers and directors) to defraud Corcoran in the sale of the hand tool division.[3]

Following the Supreme Court's decision in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the district court denied Dresser's first motion to dismiss, concluding that Corcoran had alleged a pattern of racketeering activity under RICO. The court found it sufficient to allege that "Dresser engaged in numerous acts of related racketeering ac-

tivity over a continuous period of time in furtherance of their [sic] scheme to defraud plaintiffs." *Corcoran Partners, Ltd. v. Dresser Indus., Inc.*, No. 84 C 4506, mem. op. at 7 (N.D.Ill. Dec. 18, 1985) [available on WESTLAW, 1985 WL 4867].

Two years later, the court granted Dresser's renewed motion to dismiss in light of *Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322 (7th Cir.1986), and *Morgan*, 804 F.2d 970. It held that multiple acts of mail and wire fraud causing a single injury to a single victim in a single transaction do not form a pattern of racketeering activity. *Corcoran Partners, Ltd. v. Dresser Indus., Inc.*, No. 84 C 4506, mem. op. at 9 (N.D.Ill. Jan. 29, 1987).

## II.

In a civil RICO action, a plaintiff must prove that a defendant engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962(a)-(c). "Racketeering activity" includes mail and wire fraud.[4] *Id.* § 1961(1)(B). In its definitional section, the statute simply states that a " 'pattern of racketeering activity' requires at least two acts of racketeering activity" occurring within a ten-year period. *Id.* § 1961(5). The Supreme Court, in its famous footnote 14 to *Sedima*, attempted to put some flesh on the statute's skeletal definition. Essentially the Court advised that there must be "continuity plus relationship" among the various acts of racketeering activity to constitute a pattern. *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.[5]

3. The acts of mail and wire fraud include: (1) telephone conversations between Sebastian and Downey, both of whom worked for Dresser, concerning letters of intent; (2) telephone conversations between Sebastian and Corcoran about the terms of the sale; and (3) letters sent by Dresser to Corcoran concerning the Effective Date Balance Sheet and the Purchase Agreement.

4. A person commits mail or wire fraud by using the mails or wires for the purpose of executing a scheme or artifice to defraud. 18 U.S.C. §§ 1341, 1343.

5. The Supreme Court reasoned that:
while two acts [of racketeering activity] are necessary, they may not be sufficient. In-

deed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern."
*Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985) (Supreme Court's emphasis) (citation omitted).

Since *Sedima*, this court has faced an astonishing number of cases involving the issue whether defendants had engaged in a pattern of racketeering activity. *See Jones v. Lampe*, 845 F.2d 755, 756 n. 4 (7th Cir.1988) (citing previous cases). We have avoided, either by accident or design, the formulation of any controlling definition of "pattern." The absence of an explicit definition has at least preserved the flexibility needed to make some sense out of civil RICO cases. Presumably (although there is no real way of knowing) we have complied with the Supreme Court's requirement that there be "continuity and relationship among the predicate acts" to constitute a pattern. *Morgan*, 804 F.2d at 975. In what is essentially a fact-specific inquiry, we consider a number of relevant factors, including: "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Id.* This approach allows us, consistent with Congress' intent "to promote aggressively private actions for those injured by racketeering activity," to allow civil remedies "where a true 'pattern' of prohibited activity [exists], not just sporadic or isolated instances of fraud." *Jones v. Lampe*, 845 F.2d at 757.

We agree with the district court that this case closely resembles the situation in *Lipin*. There, we held that twelve acts of mail fraud furthering several misrepresentations of the value of a company for sale did not comprise a pattern of racketeering activity. *Lipin*, 803 F.2d at 324. The defendant had overstated the net worth of the company that the plaintiff had purchased, and it had also omitted several equipment and open-end leases from the lease inventory upon which the plaintiff had relied in deciding to buy the company.

*Id.* at 323. In refusing to find a pattern of racketeering activity, we noted that the defendant's mailings defrauded only the purchaser on only one occasion (the sale of the company).[6] *Id.* at 324. In a subsequent case, we offered a more complete explanation of our decision in *Lipin:*

> The mere fact that the complexity of the transaction generates numerous pieces of paper and hence a greater number of possible fraudulent acts does not make these predicate acts ongoing over a period of time so as to constitute separate transactions that are distinct in time and place. Since these predicate acts were all made in a fairly short period of time (several months), and all clearly relate to the same transaction (the acquisition of a large block of stock), involve a single scheme and a single victim, and create a single injury, the acts in *Lipin* do not satisfy the continuity aspect of the pattern of racketeering activity.

*Morgan*, 804 F.2d at 976–77.

■ In the present case, Dresser's several acts of mail and wire fraud resulted in a single transaction. These predicate acts were committed over the course of a few months in furtherance of a scheme to receive more for the division than it was worth, but they defrauded only one victim (Corcoran) on only one occasion (the sale of the division). The fraudulent misrepresentations were directed specifically at Corcoran for the sole purpose of inducing it to buy the division at an inflated price. The misrepresentations cannot fairly be viewed as constituting separate transactions, a key factor under *Lipin* and *Morgan*, since they did not have any effect on Corcoran until it decided to buy the division. Moreover, as in *Lipin*, there has been no threat of continuing fraudulent activity by Dresser after the division was sold.[7]

*Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322, 324 (7th Cir.1986).

---

6. We specifically stated the following:

Lipin's complaint alleges racketeering acts all designed to defraud one victim, Lipin, on one occasion, the sale of Rifco. Lipin cannot allege that the defendants defrauded another victim with similar racketeering activity and cannot allege that Lipin has been defrauded more than once by the defendants through similar racketeering acts.

7. In *Lipin*, we cautioned:

Whatever more is required to allege a pattern of racketeering activity, that something more is lacking here. The pattern requirement was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant

Corcoran nevertheless seeks to distinguish its case from *Lipin* on the grounds that it involved multiple schemes. This circuit rejected a *per se* rule requiring the presence of separate schemes in *Morgan.* 804 F.2d at 975. Despite this basic stance, it might be of interest that, of the eight post-*Morgan* cases in which we found single schemes, we were willing to find a pattern of racketeering activity in only two. *See Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1305 (7th Cir.1987) (each falsely prepared invoice deprived plaintiff of rent or replacement value); *Appley v. West,* 832 F.2d 1021, 1028 (7th Cir.1987) (each act of mail fraud furthered the conversion of funds from separate bank accounts). In a recent clarification of the pattern requirement, a panel of this court identified these two cases as exceptions to a trend associating a pattern of racketeering activity with multiple schemes. *Jones v. Lampe,* 845 F.2d at 758–59. These observations, of course, must be read in connection with *Morgan* which, as noted, rejected a multiplicity of schemes as the definite touchstone.

In any event, a defendant's involvement in multiple schemes is important evidence of a pattern of racketeering activity. Thus, in an effort to demonstrate more than one scheme, Corcoran alleges in its complaint that the scheme to misrepresent the division's true value was more than a plan to defraud Corcoran; its original design was to conceal the division's heavy losses from various Dresser officers and directors. Corcoran asserts that, in effect, two schemes converged: the first scheme, executed by division employees, deceived Dresser officers and directors; the second, executed by Dresser through the sale of the division, defrauded Corcoran.

In a suit against Dresser, the only relevant scheme is the one perpetrated by Dresser to defraud Corcoran. There are two obstacles to holding Dresser responsible for acts of the division employees in concealing, from the officers and directors, the division's true financial condition. First, Corcoran is essentially asking us to consider Dresser both a victim and a perpetrator of the same misrepresentations. This we decline to do, for the primary purpose of RICO is to "reach those who ultimately profit from racketeering, not those who are victimized by it." *Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 402 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Dresser cannot be counted as a victim of its employees' fraud if it gained from the fraud when it sold the division to Corcoran. Second, if the division employees truly defrauded the officers and directors, the division employees, not Dresser itself, defrauded Corcoran. Dresser would have been merely an "unwilling conduit" of the employees' fraud, unaware that it was selling the division for more than it was worth. Dresser cannot be held vicariously liable under RICO for the independent acts of its employees. *D & S Auto Parts, Inc. v. Schwartz,* 838 F.2d 964, 968 (7th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988).

Moreover, the gravamen of Corcoran's complaint is that Dresser committed fraud in the sale of the division. This requires us to accept that Dresser's key officers and directors knew that they were misrepresenting the division's financial condition to Corcoran. Acceptance of this allegation precludes us from accepting that Dresser was somehow deceived by the division employees. If Dresser was not deceived by the employees of the hand tool division, then the only victim of the scheme is Corcoran and there was, in reality, only one scheme.[8]

---

as a person who regularly commits such crimes. RICO is not "aimed at the isolated offender." There must be some indication of a "threat of continuing activity" by the defendants, not just one instance of fraud with a single victim.

*Id.* (citations omitted).

8. In the recent case of *Jones v. Lampe,* a bank allegedly had engaged in a single fraudulent loan transaction. We rejected the plaintiffs' characterization of the bank's "cover-up" activities as a separate scheme. To do so, we feared, would turn every transaction "into a 'multiple scheme' if the defendant denies wrongdoing." *Jones v. Lampe,* 845 F.2d 755, 759 (7th Cir.1988).

Of course, it could be argued that the division employees' scheme to overstate its financial condition also defrauded investors in Dresser who relied on the fairness of the market price of the company's stock in buying or selling it. With this gloss, the scheme could have multiple victims. Indeed, Corcoran pleads in its complaint that one of the effects of the scheme was to "deceive ... the investing public as to the financial condition of the Hand Tool Division and Dresser." Corcoran, however, abandons this contention in its brief on appeal, choosing instead to focus exclusively on the deception of certain officers and directors of Dresser.

Even considering this "fraud on the public" allegation in the complaint, we cannot validly accept a claim that Dresser defrauded investors generally. Corcoran's complaint contains no well-pleaded facts permitting us to conclude that some investors may have been hurt by the alleged fraud. The complaint does not tell us, for example, whether the price of Dresser stock reflected the misrepresented value of the division, whether any investor relied on the accuracy of the division's value as represented or whether any investor was injured in so relying. We do not know from the complaint how the employees originally overstated the division's financial condition or whether the overstatement amounted to fraud. The public may well not have been affected by misrepresentations of the division's value; perhaps only Dresser's officers and directors were misled.

Moreover, the allegation that the employees' scheme defrauded the investing public, as well as Dresser officers and directors, does not circumvent the problem of imposing vicarious liability on Dresser. If Dresser cannot be held responsible under RICO for the scheme of its employees to deceive Dresser officers and directors, it likewise cannot be vicariously liable even when that scheme misleads the investing public.

In addition, the alleged acts of mail and wire fraud furthered only the scheme to defraud Corcoran. The telephone calls between Sebastian and Downey, as well as the correspondence between Dresser and Corcoran, all pertained to the sale of the division. Corcoran has failed to allege any acts of mail or wire fraud, or other instances of racketeering activity, that executed a scheme to defraud the investing public in the sale of securities.

Although we can conceive of a situation in which a company's scheme to misrepresent the value of a division could defraud both those who trade in the company's stock and the party who eventually purchases the division, this is not such a case. To show two victims, plaintiffs, at a minimum, would have to allege that the company's misrepresentations artificially inflated its stock price, that certain investors relied on those misrepresentations in purchasing the stock and that they were harmed by the misrepresentations. Corcoran has not alleged as much; accordingly, we reject its contention that Dresser's racketeering activity involved multiple victims.

We also reject Corcoran's assertion that it suffered multiple injuries. Corcoran likens this case to *Liquid Air*, where we held that "repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for purposes of civil RICO." 834 F.2d at 1305. In *Liquid Air*, the defendant had engaged in a seven-month scheme of falsifying nineteen separate shipping orders documenting returns to the plaintiff of leased gas cylinders that had never been made. The defendant, through its fraud, had been saving rental and replacement fees for the cylinders, while retaining the cylinders for its own use. With each falsified order, the defendant was depriving the plaintiff of rent or replacement value for the cylinders. Thus,

Similarly, in the case before us, were we to accept Corcoran's "two-scheme" argument, we would be required to find a multiple scheme transaction every time some but not all of the employees of a defendant corporation were aware of the fraudulent conduct, because it would be fairly simple for a plaintiff to allege that some of the employees were defrauding others.

each predicate act caused plaintiff distinct economic harm.

This case does not involve the "repeated infliction of economic injury." *Id.* The acts of mail and wire fraud did not each cause separate harms to Corcoran. Instead, the acts, which amounted to various fraudulent misrepresentations, contributed to a single economic injury. Only when Corcoran actually bought the division did the several misrepresentations combine to create the harm of paying more for the division than it was worth. Corcoran's many asserted injuries—having to honor outstanding lift commitments, recognizing the liability of a cooperative advertising allowance that was not on the books and bearing a cut in marketing costs—either stemmed from or were a part of the single harm resulting from the purchase of the division.

We thus conclude that Dresser's misrepresentation of the hand tool division's true financial condition does not constitute a pattern of racketeering activity. That the scheme may have originated before Dresser decided to sell the division does not matter for our purposes. Although several acts of mail and wire fraud were involved, they were all committed after Corcoran expressed its desire to buy the division. The predicate acts resulted in only one transaction, which caused only one harm to one victim.

### III.

■ Corcoran also appeals the district court's award of costs to Dresser in the amount of $41,318.50. In seeking a remand on this issue, Corcoran's burden is great, for district courts have broad discretion to determine whether and to what extent costs may be awarded to prevailing parties. As long as there is statutory authority for allowing a particular item to be taxed as a cost, we will not overturn a district court's decision that the cost was necessary to the litigation nor its determination of what amount is reasonable, absent, of course, a showing of clear abuse of discretion. *State of Illinois v. Sangamo Constr. Co.,* 657 F.2d 855, 864 (7th Cir.

1981). Thus, we review carefully whether an expense is recoverable, but when we determine that it is, we defer to the district court, which "is in the best position to determine the reasonableness of the cost." *Id.*

The district courts derive their authority to tax costs from Fed.R.Civ.P. 54(d), which states in part:

> Except when express provision therefor is made either in a statute of the United States or in fixed rules, costs shall be allotted as of course to the prevailing party unless the court otherwise directs
>
> . . . .

Under 28 U.S.C. § 1920, a federal court may tax as costs:

> (1) Fees of the clerk and marshall;
>
> (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
>
> (3) Fees and disbursements for printing and witnesses;
>
> (4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
>
> (5) Docket fees under section 1923 of this title.

Corcoran argues that the district court awarded deposition transcript costs, which represented the bulk of the award, in violation of section 1920. According to Corcoran, because deposition transcript costs are not enumerated in section 1920, which has been determined by the Supreme Court to be an exhaustive list of costs taxable in favor of prevailing parties, the court was without authority to award them to Dresser. *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* — U.S. ——, 107 S.Ct. 2494, 2497, 96 L.Ed.2d 385 (1987).

We have held, however, that deposition transcripts are taxable under section 1920(2) as "stenographic transcript[s]." *Hudson v. Nabisco Brands, Inc.,* 758 F.2d 1237, 1242–43 (7th Cir.1985). Thus, the issue arises whether *Crawford Fitting* overrules our interpretation of section 1920(2).

We agree with Corcoran that the Supreme Court's decision "illustrates that a more restrictive and limited approach should be taken in awarding costs." Brief for Appellants at 12–13. The Court explicitly rejected Rule 54(d) as "a separate source of power to tax as costs expenses not enumerated in § 1920." *Crawford Fitting*, 107 S.Ct. at 2497. Prior to this decision, courts had relied on the language in the rule, "unless the court otherwise directs," to exercise their discretion occasionally to award costs not explicitly allowed by statute. *Id.* at 2500 (Marshall, J., dissenting); *see, e.g., Sangamo Construction*, 657 F.2d at 864 & n. 11; *Wahl v. Carrier Mfg. Co.*, 511 F.2d 209, 215–18 (7th Cir.1975).

The district court here, however, did not award costs outside statutory authority. In fact, it explicitly limited itself to those costs enumerated in section 1920. Thus, the court must have viewed deposition transcripts as covered by section 1920.

■ Even though section 1920 does not specifically mention depositions, we do not think that *Crawford Fitting* necessarily precludes courts from finding that deposition transcripts are authorized by that statute. We agree with the Fifth Circuit that the Supreme Court did not "prevent courts from interpreting the meaning of the phrases used in § 1920." *West Wind Africa Line, Ltd. v. Corpus Christi Marine Servs.*, 834 F.2d 1232, 1238 (5th Cir.1988); *see also La Vay Corp. v. Dominion Fed. Savs. & Loan Ass'n*, 830 F.2d 522, 528 (4th Cir.1987) (reasonably necessary deposition transcript costs may be recoverable but *Crawford Fitting* requires denial of certain expert fees), *cert. denied,* —— U.S. ——, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988); *Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1550 (10th Cir.1987) (section 1920 permits recovery for deposition transcripts and *Crawford Fitting* limits the

recovery of expert witness fees). Thus, we hold that deposition transcript costs may be awarded under section 1920(2).[9]

■ Alternatively, Corcoran argues that the district court arbitrarily arrived at $30,-000 in awarding deposition transcript costs. We agree that the district court did not describe the process by which it determined that figure. The court, however, did purport to ascertain which deposition costs were "reasonably incurred." We are not willing to say that it abused its discretion in this regard.[10]

■ Similarly Corcoran argues that the award of $10,000 for photocopying costs was arbitrary. Although we would have preferred the district court to explain why $10,000 was a reasonable amount, we cannot say that it abused its discretion in arriving at that amount. Dresser sought $18,631.92. The court responded to this "extraordinarily large" request by drastically reducing the award. We will not overturn this decision.

Corcoran complains next that most of Dresser's witnesses were paid more than the $30 provided by 28 U.S.C. § 1821. Dresser responds that in its claim for witness fees, it expressly included mileage allowance calculated under section 1821. Thus, although Dresser may not have properly documented its request (with, for example, receipts), the court was entitled to rely on Dresser's representation that it complied with the statute.

■ Corcoran also contends that, although the district court agreed that it would be unjust to tax all costs associated with the fraud claim (which was at that time pending in state court), the district court never *explicitly* made any deductions from Dresser's claimed costs to account for this. In Corcoran's view, the district court

---

**9.** Similarly, pretrial transcript costs in the amount of $40 were properly taxed under section 1920(2).

**10.** We also reject Corcoran's argument that the award of the deposition transcript costs violated Local Rule 45(b) because they included miscellaneous charges. Local Rule 45(b) states in part:

> Except as otherwise ordered by the court, only the cost of the original of such transcript or deposition together with the cost of one copy each where needed by counsel . . . shall be allowed.

In our view the rule permits the court some discretion to tax more than just the original transcript plus one copy.

should have requested Dresser to submit a bill illustrating which costs were incurred in conducting discovery in the fraud claim. Such a requirement of Dresser would have been unreasonable. Corcoran filed a four-count complaint against Dresser. Some of the costs incurred could have been associated with more than one of Corcoran's claims. Discovery on the fraud and RICO claims, for example, undoubtedly overlapped. Thus, we accept the district court's explanation that it was not able mathematically to deduct expenses associated with the fraud claim, but that, in arriving at its judgment, it bore in mind the principle that they should not all be recoverable.[11]

Corcoran's final argument is that Dresser should not be allowed to recover any discovery costs associated with the RICO count, which was dismissed on the pleadings. The district court rejected this contention and we agree that "there is no requirement that the discovery cease during the pendency of a motion to dismiss unless the court has ordered a stay, which it has not done in this case." *Corcoran Partners, Ltd. v. SK Hand Tool Corp.,* No. 84 C 4506, mem. op. at 3 (N.D.Ill. Nov. 24, 1987) [available on WESTLAW, 1987 WL 20413]. The district court clearly had discretion to award Dresser "any demonstrable cost incurred in bringing about [the] dismissal [of the RICO claim]." *Id.*

We affirm the district court's award of costs largely because we are bound to review it only for an abuse of discretion. Given that "the prevailing party is normally entitled to costs as of course," J. Moore, W. Taggart & J. Wicker, 6 *Moore's Federal Practice* ¶ 54.70[3], at 54–321 (1987), and that, in this case, Dresser's request was reduced by approximately one-third, we will not overturn the district court's decision. To facilitate our review of contested costs awards, we ask the district courts, in the future, to explain in some detail how they arrived at amounts they consider to be reasonable.

## IV.

Dresser asks us to impose sanctions against Corcoran under Fed.R.App.P. 38 with respect to Corcoran's two appeals, both of which Dresser considers frivolous. We deny Dresser's requests. Although we rejected Corcoran's arguments on appeal, we do not find them frivolous. Our determination that Dresser's conduct did not constitute a pattern of racketeering activity was not a foregone conclusion. These determinations involve fact-specific inquiries in the absence of a crystalline definition of "pattern." *See Morgan,* 804 F.2d at 976 (what constitutes a pattern "depends on the facts and circumstances of the particular case"). Considerable uncertainty generally accompanies RICO claims. In this case, the district court proceedings added to the confusion. In 1985, the district court denied Dresser's motion to dismiss, concluding that Corcoran had alleged a pattern of racketeering activity. Two years later, based on new cases but on the same alleged facts, the district court changed its mind, granting Dresser's renewed motion to dismiss on the ground that Corcoran's complaint only alleged a single scheme that injured a single victim on one occasion. In view of the district court's "equivocation," Corcoran acted reasonably in bringing this appeal before us.

Moreover, even though we affirm the district court's determination of costs, this issue is a close one. The discretion we give to the district court in determining costs against the losing party, although broad, is not unbridled. There is, to begin with, an arguable issue concerning the propriety of taxing deposition transcripts against a losing party in light of *Crawford Fitting.* In addition, the derivation of some of the court's figures is questionable. The court may not have abused its discretion in reaching its costs determination, but it was not immune from criticism. Corcoran's appeal was not frivolous.

We are disturbed greatly by the nature of Dresser's requests for sanctions. Dresser made separate requests for sanc-

---

11. Corcoran argues that the court should have deducted at least the costs incurred in deposing witnesses while the motion to dismiss the fraud

claim was pending. We disagree. Discovery need not cease during the pendency of a motion to dismiss.

tions to correspond to the two issues on appeal. The two requests are *identical* and generic. Dresser's lawyers make no attempt to tailor their sanctions requests to the issues of this case. Smacking of boilerplate, the duplicative requests merely restate the law regarding Rule 38 and offer a totally non-specific application of the sanctions rule to the instant case. Neither request provides any grounds for imposing sanctions against Corcoran.

Although we shall refrain from imposing sanctions against Dresser for its flippant requests for sanctions against Corcoran, we are sharply critical of the attitude that sanctions requests can with impunity automatically attach to any appeal. We expect counsel to give considerable thought to whether an appeal is frivolous before requesting Rule 38 sanctions. *See Meeks v. Jewel Companies, Inc.*, 845 F.2d 1421 (7th Cir.1988) (per curiam). We also expect counsel to provide specific grounds for imposing sanctions.

## V.

The judgments of the district court dismissing Count IV of Corcoran's complaint and awarding costs to Dresser in the amount of $41,318.50 are hereby

AFFIRMED.