Robert CENGR, Plaintiff–Appellant,

v.

FUSIBOND PIPING SYSTEMS, INC., Defendant–Appellee.

Nos. 97–1260, 97–1804.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 20, 1997.

Decided Jan. 28, 1998.

Robert S. Minetz (argued), James J. Legner, Cowan & Minetz, Chicago, IL, for Plaintiff–Appellant.

Thomas C. Crooks (argued), Tobin & Associates, Chicago, IL, for Defendant–Appellee.

Before BAUER, FLAUM, and KANNE, Circuit Judges.

BAUER, Circuit Judge.

Robert Cengr brought this suit against his former employer, Fusibond Piping Systems, Inc. ("Fusibond"), alleging that Fusibond improperly terminated him because of his age. The district court granted summary judgment in favor of Fusibond and ordered Cengr to pay Fusibond's costs, and Cengr appeals. We affirm the district court's grant of summary judgment, but reverse on the issue of costs.

### BACKGROUND

Fusibond is a small, privately owned company which designs, manufactures, and sells lined piping systems. Fusibond's pipe systems are used to carry primarily toxic chemicals and gases. Robert Cengr began working for the precursor company of Fusibond in April of 1976. When Cengr started work for Fusibond, his primary responsibility was flaring pipes, and eventually he did a variety

of duties as a supervisor for Fusibond. From the time he became a supervisor in 1978 until his termination in 1993, Cengr's primary responsibility was quality control. This entailed examining pipes, fittings, and other items during the manufacturing process and prior to shipment to ensure the pipes met all of Fusibond's quality criteria.

Cengr received his first major performance warning in a written statement dated May 1, 1985 from the Vice President of Operations, Carl Wacker. The warning cited "frequent lapses in Fusibond quality control," and advised Cengr that "future negligence in this area may be cause for dismissal." In May of 1989 Carl Wacker died, and Cengr and Fusibond's president, Richard Krause, took over Mr. Wacker's responsibilities. According to Krause, Cengr performed his duties well until 1991, when he began to receive repeated censures.

In 1991, Fusibond began receiving complaints from customers regarding manufacturing defects which should have been discovered by Cengr in quality control. One customer sent Fusibond a video of a defective piping system, which showed water spewing from every joint. The pipes shown in the video had passed through Cengr's quality control.

On November 11, 1991, Cengr received a written warning from Fusibond's president, Richard Krause, regarding his "failure to follow verbal and written instructions regarding proper QC [quality control]." Krause told Cengr that at Cengr's age of 49, close to 50, it was hard to find a job, and that Cengr should think about that in considering his job performance. Cengr was placed on thirty days probation.

In March of 1993, Cengr was twice passed over for promotion. George Piotrowski, who previously shared the same level of responsibility as Cengr, was promoted to plant manager and became Cengr's supervisor. Cengr did not disagree with Piotrowski's promotion and did not believe the promotion should have gone to him. Piotrowski was 43 years old at the time of his promotion. Steve Boardman, then age 29, was also promoted in March of 1993, to production supervisor. Before Boardman's promotion, Cengr supervised Boardman. After the promotion, Boardman took over Cengr's supervisory duties in the machine shop area, Cengr's duties regarding the ram extrusion process, and his duties regarding any special products.

In June of 1993, Cengr was again reprimanded for his poor work performance. On June 18, 1993, Cengr was given a written warning and was placed on probation for personal problems with another Fusibond employee. Cengr and employee Larry Sawicki had engaged in "screaming matches" regarding coordination of their work efforts due to Cengr's delay in completing his quality control responsibilities. When Cengr's performance did not improve, his probation was extended "until further notice." During the summer of 1993, Fusibond encountered several more instances of Cengr's poor performance, culminating on September 20, 1993, when his responsibilities were limited. Cengr's duties regarding inventory, production scheduling, and expediting were assigned to Paul Jurasits, then age 29. Cengr's behavior prompted Richard Krause to inquire about Cengr's health and whether he was on any medication which might be interfering with his work. Cengr said that he was not.

Cengr's performance problems continued. On December 3, 1993, Cengr received another written warning; this time the warning included a one week disciplinary layoff without pay. Cengr was directed to "reflect on his past performance and determine where his future lies with this company." The day he returned from his one week disciplinary layoff, Richard Krause ordered a meeting of George Piotrowski, the plant superintendent; Mike Heiens, the marketing manager; Craig Krause, the customer service manager; and Kyle Manowsky, the purchasing agent and corporate secretary. The group recommended to Krause that Cengr be terminated, a recommendation which Krause did not accept. Krause pointed out that Cengr had been with the company for a long time, was once a loyal employee, and had a lot of knowledge about the Fusibond process. The group agreed that rather than terminating Cengr, his duties would be further limited.

When Cengr returned from his disciplinary layoff, he met with Heiens, Craig Krause, Piotrowski, and Manowsky, who explained to Cengr that his duties would be strictly limited to quality control. Although his salary had never been reduced when his responsibilities were limited in the past, Cengr refused to commit to a new job until he knew what his salary would be. The group explained to him that only Richard Krause had the authority to discuss salary, and Krause was not present at the meeting. Cengr then went to the general office area and confronted Richard Krause. Cengr demanded to know what his salary would be, and Krause responded by requesting that Cengr commit to accepting the job first. Although Krause claimed to having no intention of reducing Cengr's pay, when Cengr continued to refuse to commit to the job, Krause placed him on "permanent layoff." Cengr's duties were subsequently divided among current Fusibond employees.

The day after his termination, Cengr went to the Occupational Safety and Health Administration ("OSHA") to report Fusibond for alleged safety violations. He also filed a grievance report with the Equal Employment Opportunity Commission ("EEOC"), claiming in one of the reports that he was terminated because he was "the highest paid employee in the shop." Cengr reiterated this belief at his deposition. He had received significant pay raises from the mid–1980s until 1991. From 1986 through 1988, Cengr received bonuses totaling $1,325, $1,400, and $1,400 for each year, respectively. In August of 1989, Cengr received a $1,400 bonus and a $225 bi-monthly pay raise. In December of that same year he received another $500 bonus. Cengr received another bi-monthly raise of $100 in March of 1990, and bonuses of $1,500 and $2,366 in August and December of 1990. In 1991, however, Cengr received a bi-monthly pay raise of only $50 and a bonus of only $500. In 1992, Cengr's bi-monthly pay raise was $45 and his bonus $300. In 1993 Cengr received no raise and no bonus. President Richard Krause described Cengr's raises and bonuses during Cengr's last three years with Fusibond as token, noting that Cengr was taken out of the bonus program, but that Krause gave

him "a few hundred bucks at Christmas so [Cengr] wouldn't feel embarrassed."

On November 22, 1995 Cengr filed an age discrimination suit against Fusibond, alleging a violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* On December 12, 1996, Fusibond filed its motion for summary judgment. The trial court granted Fusibond's motion for summary judgment on January 10, 1997. Cengr filed a notice of appeal on February 4, 1997. On February 6, 1997, Fusibond sent its bill of costs to Cengr's attorney, requesting $2,127.08 in costs. On February 11, 1997, in response to Cengr's inquiry, the trial court set the schedule for Cengr's response to Fusibond's bill of costs. On March 21, 1997, the trial court entered a one sentence order taxing costs in the amount of $2,127.08 in favor of Fusibond. Cengr appeals, arguing that the district court erred in both granting Fusibond's motion for summary judgment and in taxing $2,127.08 in costs against him.

ANALYSIS

A. *Summary Judgment*

We review the district court's grant of summary judgment *de novo*, and decide all factual inferences in the light most favorable to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir.1996). We draw our own conclusions of law and fact from the record before us. *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir.1997). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).

B. *Age Discrimination Claim*

The ADEA prohibits employers from discriminating against employees forty years of age or older. 29 U.S.C. §§ 621(b), 631(a). A plaintiff bringing a claim under the ADEA must establish that "he would not

have been treated adversely by his employer but for his employer's motive to discriminate against him because of his age." *Denisi*, 99 F.3d at 864 (citing *Weisbrot v. Medical College of Wisconsin*, 79 F.3d 677, 680 (7th Cir.1996)). "The plaintiff need not prove that the employer was motivated by age *alone* ... it is enough that age was a 'determining factor' or a 'but for' element in the employer's decision." *Anderson v. Stauffer Chemical Co.*, 965 F.2d 397, 400 (7th Cir. 1992).

■ A plaintiff has two ways of prevailing on a claim for age discrimination. One way is to meet the burden head on by presenting direct or circumstantial evidence that age was the determining factor in the discharge. The second, and more common way, is to utilize the indirect, burden-shifting approach for Title VII cases originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later adapted to age discrimination claims under the ADEA in *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 371 (7th Cir.1992) (quoting *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988)).

■ To prevail under the *McDonnell Douglas* burden-shifting approach, a plaintiff must establish a prima facie case of discrimination. A prima facie case is established by proving: (1) the plaintiff was a member of the protected class (age 40 or over); (2) the plaintiff was doing his job well enough to meet his employer's legitimate expectations; (3) the plaintiff was discharged or demoted; and (4) the plaintiff was treated less favor-

ably than younger employees.[1] *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 890 (7th Cir.1997); *Fuka v. Thomson Consumer Elec.*, 82 F.3d 1397 (7th Cir.1996).

■ Once the plaintiff makes out a case of prima facie discrimination:

> ... this creates a rebuttable presumption of discrimination, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. If the employer is successful, the presumption dissolves, and the burden shifts back to the employee to show that the employer's proffered reasons are a pretext for age discrimination.

*Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir.1994) (citation omitted).

■ Cengr fails to make out a claim for age discrimination by either direct or circumstantial evidence.[2] He offers the following as evidence in an attempt to prove his case: (1) in 1991, president Richard Krause informed Cengr that Cengr was approaching the age of fifty and that jobs are hard to find at that age; (2) in 1993, employee George Piotrowski, then age 43, was promoted to general plant manager; (3) in 1993, employee Steve Boardman, then age 29, was promoted to production supervisor and assumed several of Cengr's supervisory duties; (4) in 1993, employee Paul Jurasits, then age 29, assumed Cengr's duties regarding inventory, production scheduling, and expediting; (5) upon his termination, Cengr's duties were assigned to Richard Krause, then age 63,[3]

---

1. As we have stated before, this Circuit has employed various formulations of the fourth element, "largely as a result of the different types of age discrimination." *Mills v. First Fed. Sav. & Loan Ass'n*, 83 F.3d 833, 843 n. 6 (7th Cir.1996); *Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1331 (7th Cir.1995). We utilize the treated less favorably standard for this single-discharge case because the discharged employee's responsibilities were absorbed by other employees, see *Gadsby*, 71 F.3d at 1332, and note that the favored employees need not be outside the protected class, i.e., under the age of forty. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). The result in this case would not differ if we were to utilize the alternative formulation of element four, which requires that the employer sought a replacement for the plaintiff. *Anderson v. Baxter*

*Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir. 1994). Because the case before us turns on whether the plaintiff established the second element, we have no occasion to discuss "the various permutations and requirements associated with the fourth and final element." *Mills*, 83 F.3d at 843 n. 6. Appellant's argument that we should reverse the district court's order because it utilized an incorrect formulation of the fourth element is therefore unavailing.

2. We note that Cengr himself relies on the *McDonnell Douglas* burden-shifting method of proof.

3. Cengr contends that it is "highly unlikely" that Richard Krause, as president of Fusibond, assumed any of Cengr's responsibilities. We express no opinion on this issue.

Craig Krause, then age 26, and Paul Jurasits, then age 29; and (6) in his deposition, Richard Krause described Steve Boardman as a "very young, creative individual." Krause's two statements and his actions in promoting three employees do not amount to an acknowledgment of discriminatory intent. *See Chiaramonte*, 129 F.3d at 396; *Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 667 (7th Cir.1995). Krause did not say that he sought to terminate Cengr because of his age, nor do his statements relate to his motivation as the decision-maker at Fusibond in terminating Cengr. *See Cheek v. Peabody Coal Co.*, 97 F.3d 200, 203 (7th Cir.1996) (to constitute evidence of direct discrimination, remarks must, *inter alia*, relate to the decisional process). Furthermore, Krause's actions in promoting two employees and assigning some of Cengr's responsibilities to a third employee are hardly direct evidence of age animus.

■ Since Cengr fails to make out a case of age discrimination by direct or circumstantial evidence, we turn to the second method of proving a claim for age discrimination and look to the *McDonnell Douglas* factors. Because we find that Cengr was not meeting Fusibond's legitimate expectations, we hold that Cengr has failed to establish a prima facie case of age discrimination. The record in this case is replete with evidence of Cengr's repeated performance problems. These problems began as early as May of 1985, when Cengr was served with a written warning which cited his "frequent lapses in Fusibond quality control." Cengr was warned at that time that "future negligence in this area may be cause for dismissal." Cengr received his second written warning in November of 1991, citing his "failure to follow verbal and written instructions regarding proper QC." This time Cengr was placed on 30 days probation. Cengr was again reprimanded for his poor performance in June of 1993, when he was placed on probation for engaging in screaming matches with another Fusibond employee. When Cengr's performance did not improve, his probation was extended "until further notice." His performance problems continued throughout the summer of 1993, culminating in September of 1993 with the limitation of his duties. Cengr

was cited for yet another performance problem in December of 1993. His warning this time included a one week disciplinary layoff without pay, and the directive to "reflect on his past performance and determine where his future lies with this company."

The evidence offered by Cengr to prove that he was meeting Fusibond's legitimate expectations misses the mark. Cengr argues that a statement made by Richard Krause during Krause's deposition, when Krause described Cengr as once being a "loyal employee" and said that Cengr "had a lot of knowledge about the Fusibond process from beginning to end," as well as the record of Cengr's pay increases and bonuses, indicate that he was meeting Fusibond's legitimate expectations. We disagree.

Krause's statement regarding Cengr's loyalty and knowledge has no correlation to Cengr's performance record. Cengr may have possessed knowledge and experience, but he was clearly performing poorly. He exhibited deficiencies in an area that was "such an important aspect of [his] job" that he was eventually terminated. *See Mills v. First Fed. Sav. & Loan Ass'n*, 83 F.3d 833, 843 (7th Cir.1996) (plaintiff failed to meet employer's legitimate expectations when she was lackadaisical in performing her quality control responsibilities which were such an important aspect of her job). Quality control is extremely important at Fusibond, mainly because the piping systems it manufactures carry dangerous gases and chemicals, such as nerve gas and chlorine. If the pipes were to leak, death or serious injury could result.

Further, Cengr is incorrect that the pay raises and bonuses he received are indications that he was performing up to Fusibond's expectations at the time of his termination. In fact, the evidence indicates that Cengr's raises and bonuses steadily declined in the last three years of his employment. Furthermore, Fusibond president Richard Krause stated in his deposition that in the last few years of Cengr's employment these raises and bonuses were merely tokens. Krause acted within his discretion in awarding Cengr holiday bonuses and token raises, even when he found Cengr's performance to

be less than favorable. We are concerned with neither the correctness nor the reasons for Krause's actions. *Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1146 (7th Cir.1994). We will not second-guess Fusibond's business decisions. *Id.* Furthermore, past raises and bonuses do not prove that Cengr was meeting Fusibond's legitimate expectations *at the time of his discharge. Stauffer Chemical,* 965 F.2d at 401 (previous pay raises are not indicative of whether the employee was meeting his employer's legitimate expectations because "[w]hat matters is whether [plaintiff] was meeting his employer's expectations *at the time of his discharge"*) (emphasis in original); *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 336 (7th Cir. 1991) (the court must focus on plaintiff's performance at the time of his termination because " 'the fact that an individual may have been qualified in the past does not mean he is qualified at a later time.' " (quoting *Grohs v. Gold Bond Bldg. Prods.,* 859 F.2d 1283, 1287 (7th Cir.1988)).

 Not only has Cengr failed to prove that he was meeting Fusibond's legitimate expectations at the time of his termination, but he also has not offered any facts to refute Fusibond's claim that his performance was substandard. *See Sirvidas v. Commonwealth Edison Co.,* 60 F.3d 375, 378 (7th Cir.1995) ("general averments of adequate performance by [plaintiff] or a co-worker are ordinarily insufficient to create a factual issue on summary judgment; rather [plaintiff] must specifically refute the facts which allegedly support the employer's claim of deficient performance."). Once "the defendant defended on the ground that the plaintiff had not satisfied his burden of showing that he was meeting his employer's legitimate expectations, ... the plaintiff was obliged to present evidence that he was, so as to demonstrate the existence of a genuine issue of material fact." *Coco v. Elmwood Care, Inc.,*

128 F.3d 1177, 1179-80 (7th Cir.1997). Cengr has failed to come forward with anything. A *de novo* review of the record thus makes it clear that Cengr was not meeting Fusibond's legitimate expectations.

Because we find that Cengr was not meeting Fusibond's legitimate expectations, we need not address the remaining *McDonnell Douglas* factors.[4] Offering an employee a new job is not tantamount to age discrimination, especially where, as here, the employee was not performing up to his employer's expectations. Accordingly, we affirm the district court's award of summary judgment in favor of Fusibond.

## C. Costs

 Cengr's final argument on appeal is that the district court erred in awarding Fusibond $2,127.08 in costs—$1,932.48 for costs associated with depositions, $182.00 in court reporter fees, and $12.60 in photocopying expenses. In reviewing the district court's award of costs, we employ an abuse of discretion standard and defer to the district court judge, who is in a better position to determine the reasonableness of the cost. *Weeks v. Samsung Heavy Industries Co., Ltd.,* 126 F.3d 926, 945 (7th Cir.1997) (quoting *SK Hand Tool Corp. v. Dresser Industries, Inc.,* 852 F.2d 936, 943 (7th Cir.1988)); *McIlveen v. Stone Container Corp.,* 910 F.2d 1581, 1582 (7th Cir.1990). "As long as there is statutory authority for allowing a particular item to be taxed as a cost, we will not overturn a district court's decision that the cost was necessary to the litigation or its determination of what amount is reasonable absent a showing of clear abuse of discretion." *Weeks,* 126 F.3d at 945 (citing *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.,* 924 F.2d 633, 642 (7th Cir. 1991)).

---

4. We also need not address plaintiff's final argument that defendant proffered a phony reason for plaintiff's termination because plaintiff fails to clear the second hurdle of the *McDonnell Douglas* factors. Specifically, because plaintiff was not meeting defendant's legitimate expectations, he has not established a prima facie case of discrimination and the burden does not shift to Fusibond to present evidence of a noninvidious reason for Cengr's dismissal. *See Coco,* 128 F.3d at 1179 (had plaintiff showed that he was meeting his employer's legitimate expectations, "the burden would have shifted to the defendant to present evidence of a noninvidious reason for the dismissal, and if the defendant then satisfied *that* burden, the plaintiff, to stave off summary judgment, would have to show that the reason was phony ("pretextual")." (emphasis in original)).

Statutory authority exists for the award of costs in this case. Under 28 U.S.C. § 1920, a federal court may tax as costs:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

 The Supreme Court has determined that 28 U.S.C. § 1920 defines the term "costs" as it is used in Rule 54(d) of the Federal Rules of Civil Procedure.[5] *Weeks*, 126 F.3d at 945 (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441, 107 S.Ct. 2494, 2497, 96 L.Ed.2d 385 (1987)). Under *Crawford*, courts are allowed to interpret the meaning of the phrases used in § 1920. *Northbrook Excess*, 924 F.2d at 643 (citing *SK Hand Tool*, 852 F.2d at 944). Accordingly, deposition costs (including transcripts) are authorized under § 1920(2) as stenographic transcripts. *Weeks*, 126 F.3d at 945; *SK Hand Tool*, 852 F.2d at 943–44. Copying costs are authorized under § 1920(4). Having found that the requested costs are statutorily recoverable, we move on to discuss whether the district court abused its discretion in finding that the costs were both reasonable and necessary.

 Applying the abuse of discretion standard to the cost award in this case is an impossible exercise given the utter lack of explanation for the award. The district court's sole language regarding the award of costs consisted of the following: "Costs are taxed in the amount of $2,127.08 in favor of defendant and against plaintiff, Robert Cengr." With nothing more to go on, we find that there was no discretion for the district court to abuse—it used none. Once again we reiterate our mandate that district court judges provide at least a modicum of explanation when entering an award of costs. We have said as much before. *See, e.g.*, *Weeks*, 126 F.3d at 946 (noting that district court's order regarding costs "might have been more clear had [it] specifically itemized those costs and addressed the [plaintiff's] arguments"); *McIlveen*, 910 F.2d at 1585 (expressing "concern over district court orders that insufficiently detail the court's reasons for denying costs"); *Weihaupt v. American Med. Ass'n*, 874 F.2d 419, 430–31 (7th Cir.1989) (remanding issue of costs for a hearing to determine whether the award of costs was reasonable in light of district court's failure to make any findings on the issue); *Hudson v. Nabisco Brands, Inc.*, 758 F.2d 1237, 1243 (7th Cir.1985), *rev'd on other grounds*, 882 F.2d 258 (1989) ("The district courts would facilitate orderly appellate review if they included findings of fact in their orders granting costs."); *Gardner v. Southern Ry. Sys.*, 675 F.2d 949, 954 (7th Cir.1982) (noting that when a trial court "refuses to award costs to a prevailing party, it should state its reason for such disallowance. Unless an appellate court knows *why* a trial court refused to award costs to the prevailing party, it has no real basis upon which to judge whether the trial court acted within the proper confines of its jurisdiction.") (emphasis in original) (citations omitted). Given the lack of even the most brief justification for the award of costs, we review the record to determine whether the costs were reasonable and necessary to the litigation. *McIlveen*, 910 F.2d at 1583; *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1282 (7th Cir.1983) (undertaking an independent review of the record in the absence of findings entered by the district court on the issue of costs). Rather than remand and waste more judicial time and resources, we will determine the amount to be taxed against plaintiff.

Fusibond is the "prevailing party" because the district court granted, and we affirm, summary judgment in its favor.

---

**5.** Rule 54(d) provides, in relevant part, that "costs other than attorney's fees shall be allowed as of course to the prevailing party unless the court otherwise directs." *See* FED.R.CIV.P. 54(d).

Plaintiff first argues that the award of costs should be reversed because the depositions were not necessarily obtained for use in this case, as required by 28 U.S.C. § 1920. Plaintiff advances the argument that because the depositions ordered were those of the defendant's employees, they were not necessary, as those employees were available to the defendant without ordering their depositions. We find such a suggestion ludicrous. The idea that employers should rely on the oral statements or affidavits of their employees rather than depositions which were already taken is a suggestion we will not entertain.

Similarly, plaintiff's argument that the depositions were used sparingly in defendant's summary judgment motion and therefore were not necessarily obtained for use in this case is also without merit. The introduction of a deposition in a summary judgment motion or at trial is not a prerequisite for finding that it was necessary to take that deposition. *Finchum v. Ford Motor Co.*, 57 F.3d 526, 534 (7th Cir.1995); *Hudson*, 758 F.2d at 1243. The proper inquiry is whether the deposition was "reasonably necessary" to the case at the time it was taken, not whether it was used in a motion or in court. *Finchum*, 57 F.3d at 534. We find that the deposition transcripts of Robert Cengr, Richard Krause, Craig Krause, Kyle Manowsky, and Mike Heiens were reasonably necessary to the preparation of the defendant's motion for summary judgment. These individuals were witness to several of the events giving rise to plaintiff's termination, one of the individuals is the president of defendant's company, and one is the plaintiff in the action. It was entirely reasonable for defendant to order these transcripts.

Plaintiff's second argument against the taxing of costs in Fusibond's favor is similarly without merit. Plaintiff claims that the copying costs of his EEOC file by defendant should not be taxed against him because the file was not necessarily obtained for use in this case. Plaintiff again raises as proof the fact that the defendant sparingly used the documents contained in the EEOC file. Use of information contained in a file is not a prerequisite to finding that it was necessary to copy the file. *Finchum*, 57 F.3d at 534; *Hudson*, 758 F.2d at 1243. We do not believe that a $12.60 copying expense is unreasonable. Plaintiff's suggestion that the defendant should have inspected the file prior to incurring $12.60 in copying charges borders on dopiness. The legal fees involved in undertaking such an inspection would far outweigh the minuscule copying costs. We therefore find that the $12.60 cost incurred in copying charges is entirely reasonable.

Plaintiff next argues that the district court erred in not reducing costs pursuant to Local Rule 45(B) of the Northern District of Illinois. The Rule in effect at the time these costs were incurred provided that:

> . . . the expense of any prevailing party in necessarily obtaining all or any part of a transcript for use in a case, for purposes of a new trial, or amended findings, or for appeal shall be taxable as costs against the adverse party. If in taxing costs the clerk finds that a transcript or deposition was necessarily obtained, the costs of the transcript or deposition shall not exceed the regular copy rate as established by the Judicial Conference of the United States and in effect at the time the transcript or deposition was filed unless some other rate was previously provided for by order of court. Except as otherwise ordered by the court, only the cost of the original of such transcript or deposition together with the cost of one copy each where needed by counsel and, for depositions, the copy provided to the court pursuant to General Rule 18 C, shall be allowed.

Local Rule 45(B) (1996). The regular copy rates as established by the Judicial Conference for the time in question (and still currently in effect) set the following prices as outside limits for reimbursement:

| Type of Transcript | Original | First Copy to Each Party | Each Additional Copy to the Same Party |
|---|---|---|---|
| Ordinary Transcript | $3.00 | $0.75 | $0.50 |
| Expedited Transcript | $4.00 | $0.75 | $0.50 |
| Daily Transcript | $5.00 | $1.00 | $0.75 |
| Hourly Transcript | $6.00 | $1.00 | $0.75 |

■ We note that some courts in the Northern District of Illinois have found that these rates only apply to transcripts ordered from an official court reporter. *See, e.g., Apostal v. City of Crystal Lake*, 165 F.R.D. 508 (N.D.Ill.1996); *Pilsen Neighbors Community Council v. Netsch*, No. 80 C 5501, 1991 WL 49607 (N.D.Ill.1991). However, we find nothing in the rule to indicate as much. The distinction apparently generates from a General Order issued by then-Chief Judge Grady in 1986, which provided that "the maximum rates per page of transcript that official reporters of this Court, other than reporters under a contract, may charge are as follows...." *See Pilsen*, 1991 WL 49607 at *2. Local Rule 45(B), in all of its previous or subsequent versions, and the Judicial Conference materials which discuss the regular copy rates are totally lacking in a distinction between transcripts ordered from official or private court reporters. We therefore decline to adopt a distinction, and find that the Judicial Conference rates apply to deposition charges by private court reporters.

■ Defendant submitted, and the district court taxed, costs for deposition transcripts as follows:

| Deponent | Claimed Cost |
|---|---|
| R. Krause | $ 414.85 |
| C. Krause | $ 175.69 |
| K. Manowsky | $ 73.80 |
| M. Heiens | $ 192.74 |
| R. Cengr | $1,257.40 |
| Total: | $2,114.48 |

After an unnecessarily detailed scrutiny of the receipts submitted in this case, we find that the amount of $2,114.48 for deposition

transcripts is unreasonably high. We therefore turn to discuss the fees sought by Fusibond for each deposition.

### 1. Richard Krause

Fusibond seeks $414.85 for a copy of the deposition transcript of its president, Richard Krause. This bill includes $395.65 for the 193 page deposition transcript, and $19.20 for 60 pages of exhibits. Because Fusibond was already in possession of the deposition exhibits—plaintiff provided extra copies of the exhibits to defendant at the deposition and produced the same exhibits during discovery—we will not allow Fusibond to recover the costs of copying the 60 pages of exhibits ($19.20). As for the 193 page deposition transcript, $2.05 per page [6] is far above the $0.75 rate established by the Judicial Conference for a deposition copy. Accordingly, we reduce the cost to be taxed against plaintiff for a copy of the deposition transcript of Richard Krause to $144.75.[7]

### 2. Craig Krause

Fusibond seeks $175.69 for a copy of the deposition transcript of Craig Krause. This bill includes $141.45 for the 69 page deposition transcript, and $34.24 for 107 pages of exhibits. As we explained above, because Fusibond was in possession of the deposition exhibits, we will not allow it to recover for the costs of making additional copies. As for the 69 page deposition transcript, we reiterate that $2.05 far exceeds the Judicial Conference copy rate.[8] Accordingly, we reduce the cost to be taxed against plaintiff for a

---

**6.** $395.65 ÷ 193 pages = $2.05

**7.** 193 pages × $0.75 = $144.75

**8.** $141.45 ÷ 69 pages = $2.05

copy of Craig Krause's deposition to $51.75.[9]

### 3. Kyle Manowsky

Fusibond seeks $73.80 for a copy of the 36 page deposition of Kyle Manowsky. This charge represents a $2.05 copy charge per page.[10] Again, we reduce this cost to conform to the copy rates established by the Judicial Conference. Accordingly, we order the plaintiff to pay $27.00 for the copy of Kyle Manowsky's deposition.[11]

### 4. Mike Heiens

Fusibond seeks $192.74 for a copy of the deposition transcript of Mike Heiens. This bill includes $168.10 for the 82 page deposition transcript and $24.64 for 77 pages of exhibits. Again, we refuse to tax costs against plaintiff for a copy of the exhibits defendant already possessed. Additionally, the $2.05 per page copy rate [12] far exceeds the $0.75 copy rate established by the Judicial Conference. Accordingly, we reduce the cost for the copy of Mike Heiens' deposition transcript to $61.50.[13]

### 5. Robert Cengr

Fusibond seeks $1,257.40 in total costs for the deposition of plaintiff Robert Cengr. This bill represents $182.00 for the services of a court reporter [14] and $1,075.40 for an expedited transcript. The costs of the court reporter were properly taxed against plaintiff. However, plaintiff argues that the cost of his transcript should be reduced because defendant delayed five months in ordering the deposition. Cengr was deposed on May 10, 1996, but Fusibond did not order the transcript until October 25, 1996, and then did so on an expedited basis at a cost of $3.80 per page. Defendant counters that it delayed in ordering Cengr's deposition transcript because it thought Cengr would settle the case. While defendant may have been waiting for the plaintiff to settle, it seems only natural that settlement or no settle-ment, the deposition of the plaintiff was important to order. Defendant cannot wait until the last minute, incur additional expenses from its delay, and then stick plaintiff with the bill. Accordingly, we find that plaintiff is only responsible for "ordinary" service, or $3.00 per page for an original deposition transcript. Plaintiff should be taxed in the amount of $849.00 [15] for the deposition transcript of Robert Cengr, plus $182.00 in court reporter services, for a total of $1,031.00. We therefore order plaintiff Robert Cengr to pay Fusibond $1,316.00 in costs. The parties shall bear their own costs of this appeal.

### Conclusion

We AFFIRM the district court's grant of summary judgment in defendant Fusibond's favor because plaintiff was not meeting Fusibond's legitimate expectations. We VACATE the district court's award of costs, and REMAND with the instruction that the court enter an order awarding the defendant $1,316.00 in costs.

---

9. 69 pages × $0.75 = $51.75

10. $73.80 ÷ 36 pages = $2.05

11. 36 pages × $0.75 = $27.00

12. $168.10 ÷ 82 pages = $2.05

13. 82 pages × $0.75 = $61.50

14. 7.0 hours × $26.00 = $182.00

